LOGUE, J.
Let Miami Beach Decide, a Florida Political Committee (“the Political Committee”), appeals a declaratory judgment entered in favor of the City of Miami Beach and SBACE, LLC. The dispute concerns two ballot questions relating to section 1.03(b)(2) of the Miami Beach Charter (“the Charter Provision”).
The Charter Provision provides that the lease of certain properties in the vicinity of the Miami Beach Convention Center for ten years or longer must be approved by a majority vote of the voters in a City-wide referendum. The first ballot question at issue (“the charter amendment question”) is the result of a citizen’s initiative. It proposes an amendment to the Charter Provision to increase the required voter approval from fifty to sixty percent. The second ballot question at issue (“the lease approval question”) is a referendum placed on the ballot by the City. It asks the voters to approve, pursuant to the Charter Provision, a lease of certain properties to SBACE for ninety-nine years. However, the final terms of the SBACE lease have not been negotiated and the lease approval question as written does not allow the voters to learn, much less approve, material terms necessary to form a lease of real estate, such as amount of rent and an adequate description of the property being leased.
The focus of this case is whether the City framed the ballot questions in a manner that accurately communicates their true effect as required by section 101.161, Florida Statutes (2013). The apparent purpose of the lease approval question is to obtain voter approval of the lease as required by the Charter Provision. The lease approval question as written, however, does not fulfill this function. To approve a lease under the Charter Provision, the voters must be given notice of the material terms of the lease they are being asked to approve. Because the lease approval question fails to give voters this necessary information, by including such information or referring voters to records providing such information, it does not qualify as a proper ballot question to obtain voter approval of a lease. Because its true effect is different from its apparent effect, the lease approval question is confusing and violates the requirement of ballot clarity and accuracy established by section 101.161. For this reason, the lease approval question must be removed from the ballot.
FACTS AND PROCEDURAL BACKGROUND
In March 2011, the City Commission adopted a resolution that endorsed the *1285 concept of renovating and expanding the Miami Beach Convention Center, including the development of an adjacent hotel (“the convention center project”). The City Commission subsequently authorized the City Administration to issue a request for qualifications from developers. The request for qualifications was structured as a two-phased process, with phase one designated as the evaluation and selection process, and phase two designated as the negotiations process.
In April 2013, the Political Committee was formed. On July 2, 2013, the Miami-Dade County Elections Department issued a certificate finding that the Political Committee had obtained the requisite number of signatures to place the following charter amendment on a City ballot:
Sec. 1.03. — Powers of city.
[[Image here]]
(b) Alienability of property.
[[Image here]]
2. The sale, exchange, conveyance or lease of ten years or longer of the following properties shall also require approval by a majority vote of the voters in a City-wide referendum: (1) Lots West of the North Shore Open Space Park: All City-owned property bounded by 87th Street on the North, Collins Avenue on the East, 79th Street on the South, and Collins Court on the West; (2) Cultural Campus: All City-owned property bounded by 22nd Street on the North, Park Avenue on the West, 21st Street on the South, and Miami Beach Drive on the East; (3) 72nd Street Parking Lot: The City-owned surface parking lot bounded by 73rd Street on the North, Collins Avenue on the East, 72nd Street on the South, and Harding Avenue on the West; (4) Convention Center Parking Lots: All City owned surface parking lots-located-in-the Civic and' Convention Center District, generally bounded by -Lincoln Lane on the South, Washington Avenue-on the East, Meridian Avenue-on-the West and Dado Boulevard on the North; and (⅞4) Lincoln Road Parking Lots: All City-owned surface parking lots in the vicinity of Lincoln Road located within the area bounded by 17th Street on the North, Euclid Avenue on the East, 16th Street on the South, and West Avenue on the West.

3. The sale, exchange, conveyance or lease often years or longer of the following properties shall require approval by vote of at least sixty (60) percent of the City’s voters voting thereon in a Citywide referendum: (1) Convention Center Parking Lots: All City-owned surface parking lots located in the Civic and Convention Center District, generally bounded by Lincoln Lane on the South, Washington Avenue on the East, Meridian Avenue on the West and Dade Boulevard on the North; (2) Convention Center Campus: All City-oumed property, except for the Convention Center and Carl Fisher Club House, located within the Civic and Convention Center District (includes City Hall, 1701 Meridian Street, 555 17th Street, 21st Street Community Center, The Fillmore Miami Beach/Jackie Gleason Theater, and the 17th Street Parking Garage). All local laws, charter provisions and ordinances of the City in conflict with this provision are hereby repealed. This provision shall become effective immediately upon acceptance of the certification of election results by the City Commission.

In sum, the Political Committee’s charter amendment would require the lease for over ten years of certain property in the vicinity of the convention center be approved by sixty percent of the voters — as opposed to fifty percent of the voters. It also increased the properties subject to the *1286 referendum process. The acknowledged goal of the Political Committee was to have the charter amendment apply to the approval of the convention center project before any long-term lease was signed.
On July 17, 2013, after numerous public hearings and extensive public debate, the City Commission approved the selection of SBACE as the master developer for the convention center project. As part of the same resolution, the Commission directed the City Manager to negotiate a term sheet, development agreement, and ground leases for the project and submit them for approval by the Commission at a future date. The basis for the negotiations was a detailed letter of intent submitted by SBACE, consisting of over one hundred and fifty pages, which incorporated a proposed master plan for the project. By its terms, however, the letter of intent is “not intended to limit, and does not limit, any and all terms and conditions that may be incorporated into the final documents.” Among the issues to be negotiated are the amount of rent to be paid, the exact dimension of the property to be leased, the height of the air rights to be conveyed, and the nature of other consideration to be provided by the parties.
Two days later, the City Commission scheduled a November 5, 2013, special election for the purpose of presenting to the City’s electorate the two ballot measures. Although the City placed the charter amendment question on the ballot, it added language to the charter amendment question excluding its applicability to the convention center project. The Political Committee objected to the City adding such limiting language to the proposal it had placed on the ballot by citizen initiative.
The first ballot question, the charter amendment question, with the disputed language emphasized, reads as follows:
SHALL CHARTER SECTION 1.03(b) REQUIRING MAJORITY VOTER APPROVAL BEFORE CITY’S SALE, LEASE EXCEEDING TEN YEARS, EXCHANGE OR CONVEYANCE OF CONVENTION CENTER PARKING LOTS BE CHANGED TO:
• REQUIRE 60% VOTER APPROVAL INSTEAD; AND
• INCLUDE “CONVENTION CENTER CAMPUS” (ALL CITY-OWNED PROPERTY WITHIN CIVIC AND CONVENTION CENTER DISTRICT EXCEPT CONVENTION CENTER AND CARL FISHER CLUBHOUSE) WITHIN CATEGORY OF CITY-OWNED PROPERTIES SUBJECT TO 60% VOTER APPROVAL REQUIREMENT?
(THIS CHARTER CHANGE INAPPLICABLE TO “CONVENTION CENTER PROJECT” QUESTION BELOW.)
The second ballot question, the lease approval question, asked voters to determine whether the City should enter into a ninety-nine-year lease agreement with SBACE involving certain City-owned property in the vicinity of the convention center:
SHOULD CITY ENTER INTO 99 YEAR LEASES WITH SOUTH BEACH ARTS CULTURE ENTERTAINMENT (“TISHMAN”) REQUIRING PAYMENT TO CITY OF FAIR MARKET RENT ON THESE CITY PROPERTIES:
• CONVENTION CENTER PARKING LOTS;
• CONVENTION CENTER DRIVE;
• PORTIONS OF CONVENTION CENTER, CENTER’S AIR RIGHTS AND PARKING SPACES;
• 17TH STREET GARAGE SITE’S GROUND FLOOR (“GARAGE”);
*1287 FOR TISHMAN’S DEVELOPMENT THEREON OF:
• 800 ROOM HOTEL;
• 20,000 SQUARE FEET RETAIL/RESTAURANTS NORTH OF 17TH STREET;
• 70,000 SQUARE FEET RETAIL/RESTAURANTS IN THE GARAGE?
The resolutions that placed the questions on the ballot indicated that the questions were being put to the voters “[i]n accordance with provisions of the Charter of the City of Miami Beach, Florida and the general laws of the State of Florida.”
The City subsequently filed its complaint for declaratory relief, seeking a declaration that the charter amendment question complied with section 101.161, Florida Statutes, and, in particular, that it was legal for the City to add the reference that “This charter change inapplicable to the ‘convention center project’ question below.” The City asserted that such language was necessary to avoid voter confusion resulting from both questions being present on the same ballot. The City named the Political Committee as the defendant in the action, alleging that the Political Committee, as the main proponent and sponsor of the initiative petition that generated the charter amendment question, “has an actual present, adverse and antagonistic interest in the subject matter of this lawsuit.”
The Political Committee filed an answer, affirmative defenses, and a counterclaim. In an amended counterclaim, the Political Committee sought a declaration that the lease approval question had been improperly placed on the special election ballot because, under the Charter Provision, a referendum to approve a lease of the subject property to a developer cannot take place until the City and the developer enter into a lease agreement.
SBACE filed a motion to intervene, which the trial court granted. SBACE independently raised the issue of the Political Committee’s lack of standing after it intervened.
Following a hearing, the trial court entered a declaratory judgment in favor of the City and SBACE, and dismissed the Political Committee’s counterclaim for declaratory and injunctive relief for lack of standing. This appeal followed.
ANALYSIS
The Political Committee raises two issues on appeal: (1) the trial court erred in dismissing its counterclaim on the basis that it lacked standing to bring the counterclaim; and (2) the trial court erred by failing to declare that the lease approval question violated section 101.161, Florida Statutes, and the Charter Provision. We agree with the Political Committee on both grounds.
I. STANDING
With regards to the first question, the City waived the issue of standing. First, the City waived the issue by naming the Political Committee as the defendant in its declaratory action. In that action, the City sought a declaration that the statement it had added to the charter amendment question (“This charter change inapplicable to ‘convention center project’ question below”) complied with section 101.161. In fact, the City took the position that its addition of this disputed language was necessary to dispel voter confusion that might otherwise result from having both questions on the same ballot. Thus, it is not possible to view the legality of the first ballot question without reviewing the legality of the second ballot question: the ballot questions as framed are inextricably intertwined. The City’s declaratory judg *1288 ment action brought the legality of the lease approval question into play.
Moreover, after the Political Committee filed a counterclaim challenging the lease approval question, the City did not raise the issue of standing as an affirmative defense. Krivanek v. Take Back Tampa Political Comm., 625 So.2d 840, 842 (Fla.1993) (“The issue of standing should have been raised as an affirmative defense before the trial court, and Krivanek’s failure to do so constitutes a waiver of that defense, precluding her from raising that issue now.”). Taken together, these actions constitute a waiver of standing by the City.
The City and SBACE contend that the issue of standing was preserved because SBACE independently raised the issue after it intervened. As an intervening party, however, SBACE had to take the case as it found it because the intervention was necessarily “in subordination to, and in recognition of, the propriety of the main proceeding....” Fla. R. Civ. P. 1.230. Although there is an exception to this rule for intervenors who are indispensable parties, Al Packer, Inc. v. First Union National Bank of Florida, 650 So.2d 165, 166 (Fla. 3d DCA 1995) (“We recognize that ordinarily an intervening party in an action takes the case as he or she finds it.... We conclude, however, that the rule is different where, as here, the intervenor is an indispensable party to , the action.”), SBACE does not qualify for this exception. The issues in this case concern the legality of the ballot provisions under section 101.161. These issues could be adjudicated whether or not SBACE was a party to the action. Accordingly, SBACE was not an indispensable party. See Fla. Dep’t of Revenue v. Cummings, 930 So.2d 604, 607 (Fla.2006) (“An indispensable party is one whose interest in the controversy makes it impossible to completely adjudicate the matter without affecting either that party’s interest or the interests of another party in the action.”). The dismissal of the Political Committee’s counterclaim was therefore error.
II. THE LEASE APPROVAL QUESTION
Regardless of where we begin our analysis, we are inexorably drawn to the lease approval question. We are obviously drawn to the lease approval question if we begin with the Political Committee’s counterclaim directly challenging the placement of that question on the ballot as a violation of both section 101.161 and the Charter Provision. But we are also drawn to the lease approval question if we begin with the City’s complaint. The City asks for a declaration that it is necessary to avoid voter confusion (and therefore legal under section 101.161) for the City to add to the charter amendment question the sentence “This charter change inapplicable to ‘convention center project’ question below.” Just reading this sentence requires us to look at the “question below” — the lease approval question. If the lease approval question is not properly on the ballot, then it is not necessary for the City to add language to the charter amendment question addressing it.
Turning to the lease approval question, the parties dispute whether the Charter’s requirement that voters approve of the lease of certain property means that voters must approve (1) the general concept that the property should be leased, without reference to all of its material terms, or (2) the actual lease agreement. The City argues that sound logic should dictate that the Charter Provision requires only voter approval in concept: the language that the voters must approve of the lease of certain property means only that the City Commission must “obtain the pulse of its con *1289 stituency (via referendum) prior to its commitment of municipal resources (including the costly and time-consuming process of complying with the City’s laws other than Charter Section 1.03) before undertaking lease of City property.” SBACE similarly argues that the Charter allows “the City ... [to seek] voters’ authorization to lease property before the exact terms and conditions of the lease document are fully memorialized.” The Political Committee, on the other hand, contends that the approval of the voters to a lease must be the last step in the process approving a lease and can occur only after the City Commission itself has approved the lease agreement. We do not fully agree with either position.

The Charter Provision

We begin our analysis with the current language of the Charter Provision. Section 1.03(b)(2) of the Charter states that “[t]he sale, exchange, conveyance or lease of ten years or longer of [certain enumerated] properties shall also require approval by a majority vote of the voters in a City-wide referendum.” The Charter’s use of the term “the lease” must be given due weight. “When the language of a statute is clear and unambiguous, the statute must be given its plain and ordinary meaning.” Metro. Dade Cnty. v. Milton, 707 So.2d 913, 915 (Fla. 3d DCA 1998).
The normal dictionary definition of “lease” is lease agreement or lease contract.[1] The City itself uses this definition in its Code.[2] Thus, the plain and ordinary meaning of “lease” supports an interpretation of the Charter Provision that empowers voters to approve more than simply the general proposition that a property should be leased.
This conclusion is bolstered by the use of the term “lease” in other sections of the Charter. In two adjacent subsections, for example, the Charter mandates that the “approval” by the City Commission of “the lease” of certain property be subject to super-majority votes.[3] In both of these provisions, the Charter’s use of the expression “the lease” clearly means the lease agreement: the City Commission cannot approve the lease of property in concept without knowing and approving the material terms of the lease. The use of the term “lease” to refer to a lease agreement when a lease is required to be approved by the City Commission suggests that the term “lease” similarly refers to a lease agreement when a lease is required to be *1290 approved by the voters.[4]
Moreover, this conclusion comports with the obvious purpose of the Charter provision, which was to allow the voters to approve or disapprove the lease of certain property. Reasonable people do not make such decisions in the abstract. Instead, the decision whether to approve a lease is made by weighing the competing pros and cons as reflected in the material terms of the lease agreement. A lease of a property for one dollar per year in rent may be unattractive, for example, while the lease of the same property for one million dollars per year may be quite attractive. A lease of air rights extending two hundred feet may be acceptable to surrounding neighborhoods, while the lease of air rights extending five hundred feet may not. These are the factors that the members of the City Commission use when deciding whether to approve the lease of property. It stands to reason that, where, as here, voters are empowered to approve the lease of property, they are entitled to receive the same essential information a commissioner would need to decide whether to approve the lease of property.[5]
At the same time, we cannot agree with the Political Committee that the Charter Provision was intended to control the sequence of the many steps involved in approving a lease. It might well be the preferred practice under the Charter Provision to ask voters to approve the lease only after a written lease agreement has been fully negotiated. Certainly, this practice would foreclose any litigation over whether any material terms were withheld when the voters approved the lease. We do not believe, however, that the Charter requires this practice. There is no language specifically imposing any particular sequence or timing in this regard. It is doubtful the drafters of the Charter provision intended such a result given the practical problems of timing, financing, and other matters that will undoubtedly arise and the fact that the voters’ right to receive, review, and approve the essential information can be provided in other ways. We therefore agree with the City and SBACE that the Charter Provision at issue does not require that the voters be provided with every single term or provision of the lease. We also agree that the City has the authority to control the timing of the various steps involved in finaliz *1291 ing the lease of property subject to such referendum requirements, provided the sequence it chooses does not compromise the spirit or letter of the Charter Provision.
For these reasons, we hold that the voters must be presented with, and allowed to approve, the material terms of the lease when they are asked to approve the lease pursuant to the Charter Provision. Once the voters approve of the material terms, the City is bound by such approval unless it obtains further approval by the voters.
Applying this law to the instant case, we find that the lease approval question does not provide the voter with the material terms of the lease. SBACE argues that the lease approval question asks the voters to authorize the City “to lease to SBACE specific property for specific purposes, terms, and rates.” We disagree. The ballot question does not provide voters the most basic material terms for a real estate contract, such as the amount of rent to be paid and the amount and location of the property to be leased. This information constitutes the essential minimum to create a lease under contract law.[6] Without such information, the voters are simply not in a position to intelligently cast their ballots to approve or disapprove the lease.
Although the ballot summary provides some material terms, such as the term of the lease (ninety-nine years), the general purpose of the lease, the party to the lease, and makes general reference to the properties involved, it lacks the following material provisions: the amount of rent to be paid by the developer to the City; square footage and exact location of the property to be conveyed to the developer; the height of any air rights that are being transferred; statement of other additional consideration being given by the parties, if any; and other major provisions which will constitute material provisions of any final leases of the property negotiated by the City and the developer. This information cannot be gleaned from SBACE’s letter of intent because the letter of intent by its terms is only a basis for negotiation: it does not bind the parties and the City Commission did not adopt it as its final position.

Section 101.161, Florida Statutes (2013)

We next turn to the issue of whether the lease approval question should be removed from the ballot under section 101.161. We determine that it must.
We readily acknowledge that “there is a strong public policy against courts interfering in the democratic processes of elections.” Fla. League of Cities v. Smith, 607 So.2d 397, 400 (Fla.1992). The convention center project has been the object of many public meetings and the subject of much public and private discussion. It is a signature project in one of South Florida’s signature cities.
Nevertheless, section 101.161(1) requires, in part:
Whenever a constitutional amendment or other public measure is submitted to *1292 the vote of the people, a ballot summary of such amendment or other public measure shall be printed in clear and unambiguous language on the ballot after the list of candidates, followed by the word “yes” and also by the word “no,” and shall be styled in such a manner that a “yes” vote will indicate approval of the proposal and a “no” vote will indicate rejection.
And that section also sets forth a procedure under which such ballot summaries can be challenged within the court systems. In evaluating a proposed ballot for accuracy and clarity under section 101.161, a court looks beyond the subjective criteria espoused by the amendment’s sponsor to the objective criteria indicating the ballot proposal’s main effect. Armstrong v. Harris, 773 So.2d 7, 18 (Fla.2000). This evaluation requires consideration of the ballot proposal’s “true meaning, and ramifications.” Id. at 16 (quoting Askew v. Firestone, 421 So.2d 151, 156 (Fla.1982)).
Under well-established precedent, moreover, courts are required to direct the removal of matters from the ballot where the required summary does not inform the voters of the true effect of the ballot proposal. See Askew, 421 So.2d at 156 (striking a caption and summary from the ballot where “[t]he ballot summary ... [did] not adequately reflect” the purpose of the proposed legislation); see also Fla. Dep’t of State v. Fla. State Conference of NAACP Branches, 43 So.3d 662, 668-69 (Fla.2010) (striking ballot language as misleading); Fla. Dep’t of State v. Slough, 992 So.2d 142, 148 (Fla.2008) (striking ballot question as “misleading because of its failure to mention ... one of the chief aspects of the amendment”); Armstrong, 773 So.2d at 17 (striking a ballot summary as misleading where the question implied the measure would expand constitutional rights, when, in fact, it would have the opposite effect).
The lease approval question seeks voter approval of the lease under the Charter Provision, but it does not fulfill this function. Voters must be given notice of the material terms of the lease they are being asked to approve under the Charter Provision. Because the lease approval question fails to give voters this necessary information, by including such information or referring voters to records providing such information, it does not qualify as a proper ballot question to obtain voter approval of a lease under the Charter Provision. Its true effect is different from its apparent effect. Therefore, the lease approval question is confusing and violates the requirement of ballot clarity and accuracy established by section 101.161. Under the authorities set forth above, the lease approval question must be removed from the ballot.[7]
Removal of the lease approval question here eliminates potential voter confusion, which was an articulated concern of the City. The removal of the lease approval question also obviates the need for the language that the City added to the charter amendment question. Kobrin v. Leahy, 528 So.2d 392, 393 (Fla. 3d DCA 1988).
CONCLUSION
For the above stated reasons, we direct that the lease approval question be re *1293 moved from the ballot. In light of the removal of the lease approval question from the ballot, the language added to the charter amendment question by the City— “(This charter change inapplicable to ‘convention center project’ question below.)”— shall also be removed.[8]
Reversed.[9]

. A “lease” is defined as "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, usually rent.” Black’s Law Dictionary 970 (9th ed.2009). Even non-legal dictionary definitions define the term as contractual — e.g., “[a] contract granting use or occupation of land or holdings during a specified period in exchange for rent.” The American Heritage Dictionary of the English Language 744-45 (1980).

. "Lease of city property means any right to lease city property by way of agreement, irrespective of consideration being paid to the city, and irrespective of the city's also utilizing or being allowed to utilize the property for any purpose during the term of the lease.” § 82-36, Miami Beach Code (2013).

.See § 1.03(b)(3), Miami Beach Charter (2013) ("The sale, exchange, conveyance or lease of ten years or longer of all remaining City-owned property ... shall ... require approval by a ... 6/7 vote of the City Commission."); § 1.03(e), Miami Beach Charter (2013) ("The sale, exchange, conveyance, lease, or any other transfer of any City interest in any public street-end bordering on land designated 'Government Use,’ 'Golf Course' or Waterfront land, shall require ... the unanimous approval of those members of the City Commission with power to vote....”).

. Rollins v. Pizzarelli, 761 So.2d 294, 298 (Fla.2000) ("[T]he same meaning should be given to the same term within subsections of the same statute.”); Anderson Columbia v. Brewer, 994 So.2d 419, 423 (Fla. 1st DCA 2008) ("[I]n deciphering statutory language, courts must strive to harmonize the various subsections of a statute, such that a term used on one subsection has the same meaning as the same term used in another.”).

. Both the City and SBACE cite to Miami Dolphins, Ltd. v. Metropolitan Dade County, 394 So.2d 981 (Fla.1981), to support their interpretation of the Charter Provision. Miami Dolphins, however, did not involve a city charter provision, as here, that imposed certain constraints on the manner in which an issue was put to a voter referendum. Moreover, the Florida Supreme Court subsequently cited Miami Dolphins for the proposition that the ballot question at issue was not misleading because it gave sufficient notice of the material elements of the proposed tax: "[the] ballot was not misleading and gave voters fair notice of the decision to be made where it contained a brief description of the tax plan, i.e., the rate, the group on whom it would be imposed, the expected revenues, and the planned expenditure of those revenues.” Wadhams v. Bd. of Cnty. Comm’rs of Sarasota Cnty., 567 So.2d 414, 417 (Fla.1990). These are exactly the type of material terms that are missing from the lease approval question at issue in this case, which lacks such core information as the amount of rent to be paid by the developer or even the amount of square feet of the land or the height of the airspace to be leased.

. See David v. Richman, 528 So.2d 25, 27 (Fla. 3d DCA 1988), approved, David v. Richman, 568 So.2d 922 (Fla.1990) (holding that no contract for sale of real estate existed where material terms, including the legal description of the property, were omitted); Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541, 543 (1981) (holding, with respect to an omitted rent term in a lease agreement, that "a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable"); see also Martin v. Jack Yanks Constr. Co., 650 So.2d 120, 121 (Fla. 3d DCA 1995) (holding that a proposal for construction work was not a binding contract where it did not include "a definite price or a means of determining a price not left solely to the contractor's discretion”).

. Even if the City intended the lease approval question as a straw vote on a deal that was in process, the language does not clearly indicate such. This defect would make the ballot confusing. See City of Miami v. Staats, 919 So.2d 485, 487 (Fla. 3d DCA 2005) (striking ballot question where "it fails to adequately inform the voting public that their response has no official effect, i.e., that the ballot question is simply a nonbinding opinion poll”).

. The City and SBACE successfully argued to the trial court that the charter amendment could not apply to SBACE’s proposed lease because: (1) the amendment was substantive and not procedural; and (2) the request for qualifications gave SBACE a vested right to have its lease reviewed under the existing Charter Provision. The issue of whether, if the charter amendment is adopted, the charter amendment will apply to SBACE's proposed lease is not appropriate for judicial review in this pre-election challenge to ballot language.

. In view of the time-sensitive nature of this matter, rehearing is dispensed with. See Miranda v. Ortega, 117 So.3d 1125 (Fla. 3d DCA 2012); Patterson v. Dep’t of Health & Rehabilitative Servs., 548 So.2d 1200, 1201 (Fla. 3d DCA 1989); Metro. Dade Cnty. v. Lehtinen, 528 So.2d 394, 395 n. 3 (Fla. 3d DCA 1988); Kobrin, 528 So.2d at 393 n. 4 (Fla. 3d DCA 1988).