FERNANDEZ, J.
Bruce C. Matheson appeals the final judgment entered by the trial court in favor of Miami-Dade County and International Players Championship, Inc. and against Matheson on all counts. We affirm the final judgment on all counts because the trial court’s finding that the “chief purpose” of the referendum was properly provided to Miami-Dade County voters by the title and ballot summary is correct. •
In 1986, Miami-Dade County and International Players Chámpionship, Inc. (IPC) entered into an agreement for IPC to operate a men’s and women’s professional tennis tournament from the Crandon Park Tennis Center in Crandon Park, Key Biscayne, Florida. IPC conducts what is today the Miami Open. At the time, it was the Lipton International Players Championship Tennis Tournament. The Agreement was amended in 1988 and 1990 and remains in effect through 2023.
In 1988, heirs of Malcom and Julia Matheson sued the County, alleging, among other things, that the IPC Agreement violated a deed restriction that required the County to use Crandon Park “for public park purposes only.” White v. Metro. Dade Cnty., 563 So.2d 117, 120 (Fla. 3d DCA 1990). In White, this Court held that “construction of the tennis complex did not violate the ‘public park purposes only" provision of the deed restriction.” Id. at 123-24.[1]
In 1991, the, Matheson heirs filed a second lawsuit in Dade County v. Matheson, 605 So.2d 469 (Fla. 3d DCA 1992), trying to again prohibit, the construction of the tennis stadium at Crandon Park. Id. at 470. This Court agreed with the County and held that the issue of whether or not a stadium may be built as part of the tennis complex had already been decided by this Court in White. ■ Thus, the Matheson heirs were not permitted to re-litigate the County’s ability to build the tennis stadium in the tennis complex. Id.
Thereafter, in order to resolve the litigation', the County and the Matheson heirs entered into a Settlement Agreement in 1993. This Settlement Agreement ordered the creation of the Crandon Park Master Plan, “depicting all permitted’ uses of various areas on the Crandon Park lands, including guidelines and standards for' the type, location, size, color, landscaping and other features of all structures, improvements and recreational facilities to be located” on .the Crandon Park lands. The Master Plan is contained in the Amended Final Judgment in Matheson v. Metropolitan Dade County, No. 88-24491 (Fla. 11th Cir.Ct. Oct. 18, 2000). It was also recorded as a restrictive covenant running with the land, in the public records of Miami-Dade County.
This Master Plan, however, is not fixed but rather is amenable to modification. *223 The Settlement Agreement entered into by the Matheson heirs and the County provided for ways.to amend the Crandon Park Master Plan. The Settlement Agreement stated, in part:
The Crandon Park Master Plan as implemented by the above mentioned Declaration of Restrictions and Final Judgment, may be amended following adoption only by the following procedure: (1) the County by' affirmative vote of the County Board- of Commissioners [“BOCC”] shall propose an amendment through action by resolution; (2) the County shall appoint two persons to a Committee on Amendment of the Crandon Park Master Plan, and the National Parks and Conversation . Association (or a -successor non-profit park preservation organization mutually agreed upon by the Parties) shall likewise appoint two members to such Committee on Amendment of the Cran- . don Park Master Plan
■ In addition, the Amended Final Judgment in case number 88-24491, Malcom Matheson, Jr. v. Metropolitan Dade County, reflects that 'the Master Plan can be changed. "The Declaration of Restrictive Covenants also states that amending the Master Plan is possible.[2]
Section 7.02, “Restrictions and Exceptions,” of Article 7 ⅛ the Miami-Dade County Home Rule Charter — “PARKS, AQUATIC PRESERVES, AND PRESERVATION LANDS,” states in pertinent part:
In furtherance of this policy parks shall be used for public park purposes only, and subject to the limited exceptions set forth in this Article, there shall be no permanent structures or private commercial advertising erected in a public *224 park or private commercial use of a public park or renewals, expansions, or extensions of existing leases, licenses, or concessions to private parties of public park property, unless each such structure, lease, license, renewal, expansion, extension, concession or use shall be approved by a majority vote of the voters in a county-wide referendum.
In addition, section 101.161(1), Florida Statutes (2012), states:
(1) Whenever a constitutional amendment or other public measure is submitted to the vote of the people, a ballot summary of such amendment or other public measure shall be printed in clear and unambiguous language on the ballot after the list of candidates, followed by the word “yes” and also by the word “no,” and shall be styled in such a manner that a “yes” vote will indicate approval of the proposal and a “no” vote will indicate rejection. The ballot summary of the amendment or other public measure and the ballot title to appear on the ballot shall be embodied in the constitutional revision commission proposal, constitutional convention proposal, taxation and budget reform commission proposal, or enabling resolution or ordinance. The ballot summary of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure. In addition, for every amendment proposed by initiative, the ballot shall include, following the ballot summary, a separate financial impact statement concerning the measure prepared by the Financial Impact Estimating Conference in accordance with s. 100.371(5). The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of. This subsection does not apply to constitutional amendments or revisions proposed by joint resolution.
Crandon Park is one of the listed parks in Article 7, which requires an affirmative vote of two-thirds of the electorate of Miami-Dade County before any development can occur there.
Consequently, on August 23, 2012, the BOCC adopted Resolution R-660-12, which scheduled for November 6, 2012, a county-wide referendum election,- asking voters if they approved construction of new permanent facilities within the Cran-don Park Tennis Center. The referendum also asked voters if they approved modification of existing contractual relationships between Miami-Dade County and IPC. Specifically, the title and wording of the ballot were the following:
Referendum Regarding Structures and Modification of Existing Agreements for the Tennis Center at Cran-don Park
In accordance with Article 7 of the Home Rule Charter, do you approve as set forth in Resolution R-660-12: Erection of permanent structures and expansion of existing structures at Cran-don Park Tennis Center for public park and tennis tournament use, which shall be funded solely by tennis center and tournament revenues arid private funds; and
Modification and extension of agreements with operator of Sony Open Tennis Tournament or its’ successors?
Resolution R-660-12 included two exhibits — Exhibit A, describing “The Proposed Additional Permanent Structures,” and Exhibit B, describing the “Proposed Terms for the Extension and Modification *225 of the Existing Agreements for Usd'of the Crandon Park Tennis Center for the' Sony Open.” Exhibit A described and limited the dimension and scope of the proposed permanent structure in' great detail.' In addition, Exhibit B provided the' 'matérial terms for extending and modifying the existing agreements between Miami-Dade County and IPC. Seventy-two percent of the voters approved the referendum.
Bruce C. Matheson then brought suit against Miami-Dade County to declare the referendum unlawful. IPC moved to intervene, and the trial court allowed the intervention. In his complaint, Matheson alleged three counts: 1) that the referendum “flew under false colors” and .“hid the ball,” in violation of section 101.161(1) because it did not disclose that the expansion was prohibited by the Settlement Agreement, the Master Plan and the Declaration of Restrictive Covenants, and because it could not be implemented without approval of the Amendment Committee and a vote of the BOCC); 2) that the proposal was non-binding and thus violated Article 7 of the Home Rule Charter; and -3) that the ballot title and summary failed to disclose facts and thus violated the “Truth in Government” provision of the County Charter and that Miami-Dade County Mayor Carlos Gimenez violated the same provision by stating that the improvements would be paid for with private funds.
Matheson eventually moved for summary judgment. Following the BOCC’s approval of the agreements, the County and IPC also moved for summary judgment. The trial court denied Matheson’s motion and granted summary judgment against Matheson on all three counts of his complaint. On appeal, Matheson contends that the ballot language fails the- requirements of section 101.161(1) by “hiding the ball” and “flying under false colors.”
The standard of review of a trial court’s ruling on a summary judgment motion is de novo. Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). However, with regard to the ballot question at issue in this appeal, this Court should invalidate, it “only if the record shows that the [ballot language] is clearly and conclusively defective.” Armstrong v. Harris, 773 So.2d 7, 11 (Fla. 2000).
' Section' 101.161(1) requires that the substance- of the public measure be printed in “clear and unambiguous” language on the ballot. According to City of Miami v. Staais, 919 So.2d 485, 487 (Fla. 3d DCA 2005), “[t]he purpose of this requirement is to provide the voter with fair notice of the content of the proposed measure so that he or she will not be misled as to its purpose and may intelligently cast his or her vote.” See also Askew v. Firestone, 421 So.2d 151, 155 (Fla.1982) (stating “the ballot must give the voter fair notice of the decision he must make”). Section 101.161(1) requires that the County and IPC explain to voters, in a summary not exceeding seventy-five words, the “chief purpose of the measure.” Florida law makes it clear that the ballot question does not have to “explain every detail or ramification of the proposed amendment.” City of Riviera Beach v. Riviera Beach Citizens Task Force, 87 So.3d 18 (Fla. 4th DCA 2012) (quoting Fla. Educ. Ass’n v. Fla. Dep’t of State, 48 So.3d 694, 700 (Fla.2012)). It only must describe its chief purpose. Id.; see also Let Miami Beach Decide v. City of Miami Beach, 120 So.3d 1282 (Fla. 3d DCA 2013).
Matheson contends on appeal that the ballot did not contain sufficient details. However, there is no requirement that all the details of. a proposal must be explained to voters. Florida courts have previously held that section 101.161(1) does not re *226 quire excessive detail. See Miami Dolphins, Ltd. v. Metro. Dade Cnty, 394 So.2d 981, 987 (Fla.1981); Miami Heat Ltd. P’ship v. Leahy, 682 So.2d 198, 203 (Fla. 3d DCA 1996).
Matheson further alleges that the County and IPC “hid the ball” regarding the proposal’s chief purpose. However, this is inaccurate. As previously discussed, the Crandon Park Tennis Center improvements hinge on several approvals. As the County contends, it would be impossible for it to present any question listing all the required development approvals that were needed within the seventy-five word limit required by section 101.161(1). This is why the ballot questions referenced Resolution R-660-12, .which contained all the details,
The referendum advised voters that their approval was being sought, in accordance with Article 7 of Miami-Dade County’s Homé Rule Charter, to permit IPO to build additional permanent structures at the Tennis Center and to allow extension and modification of the agreement with IPC. The ballot question gave voters the material terms of the proposed additional permanent structures and the material terms of the extension and modification of the IPC Agreement. As such, the County and IPC are correct that the “chief purpose” of the Tennis Center Referendum was communicated. This “chief purpose” was to find out if at least two-thirds of the electorate in Miami-Dade County supported 1) the “erection of permanent structures and the expansion of existing structures at the' Crandon Park Tennis Center for public park and tennis tournament use, which shall be funded sole by tennis center and tournament revenues and private funds,” and 2) the “modification and extension of agreements with the operators of the Sony Open Tennis Tournament or its successors.” Because the chief purpose of the referendum did not alter or change procedures ■ for amending the Crandon Park Master Plan, the referendum did not violate section 101.161(1). Even after the referendum passed with two-thirds of the electorate voting in its favor, the process for obtaining the remaining required approvals stayed the same.
Three approvals are needed in order to make changes to the Master Plan: 1) voter approval via referendum; 2) the BOCC’s approval; and 3) the Committee on Amendment’s approval. Nowhere in the record does it specify in which order these approvals need to be obtained, and that is because there is no requirement that these approvals be obtained in any particular order. It just so happens that, in this case, compliance with Article 7 was the first step taken by Miami-Dade County and IPC. This was not merely a “straw ballot,” as Matheson suggests because ‘the County and IPC were required under Florida law in Article 7 of the Home Rule Charter to present this issue to the voters. Because Crandon Park is one of the listed parks in Article 7, it requires an affirmative vote of two-thirds of the electorate of Miami-Dade County before any development can occur there. The only way to get this affirmative vote was to put it on a ballot for the voters to vote.
In support of his position, Matheson cites to Askew v. Firestone, 421 So.2d 151 (Fla.1982); however this case is inapplicable here. In Askew, the trial court entered an order validating the caption and summary of a proposed constitutional amendment scheduled to appear ■ on the November 1982 general election ballot. Id. at 152. Previously, in the November 1976 general election, Florida voters approved adding section 8, the “Sunshine Amendment,” to Article II of Florida’s Constitution. Id. Section 8 declared a public office a public trust which should be *227 secure against abuse. As a result, section 8 required full, public financial disclosure by elected officers and candidates for elected offices, provided for loss of pension or retirement benefits if a public officer or employee is convicted of a felonious breach of the public trust, and prohibited members of the legislature and statewide elected officers from lobbying their former governmental bodies or agencies for two years following vacation" of office. Id, at 153.
On the next to last day of the 1982 regular session, the • legislature passed Senate Joint Resolution 1035. Id. The title read: “A joint resolution proposing an amendment to Section 8 of Article II. of the State Constitution relating to lobbying by former legislators and statewide elected officers.” Id. The proposed amendment would .remove the two-year ban on lobbying by former legislators and elected officers, retaining that ban only if an affected person failed to make financial disclosure. The title and substance proposed was the following:
FINANCIAL DISCLOSURE REQUIRED BEFORE LOBBYING BY FORMER LEGISLATORS AND STATEWIDE ELECTED OFFICERS
Prohibits former legislators and statewide elected officers from representing other persons or entities for compensation before any state government body for a period of 2 years following vacation of office, unless they file full and public disclosure of their financial interests.

Id.

The appellants .sued, the Secretary -of State to prevent inclusion of the proposed title and- substance on the November ballot. Appellants claimed the title and- substance were misleading under section 101.161 because, among other things, “the instant summary discloses only the proposed addition of financial disclosure as a condition to after-term lobbying and fails to reveal that the proposal would repeal the. existing, more stringent after-term prohibition on lobbying.” Id. at 154. The trial court: found that the language was clear and unambiguous as to the chief purpose of the, measure. The Florida Supreme. Court disagreed.
The Florida Supreme Court stated:
■ The requirement for proposed constitutional amendment ballots is the same as for all ballots, i.e., “that the voter should not be misled and that he have an opportunity to know and be on notice as to the proposition on which he is to cast his' vote...All- that' the Constitution requires or that the law compels or ought to compel is that the voter have notice of that which he must decide_What the - law requires is that the -ballot be fair and advise the voter sufficiently to enable him intelligently to cast his- ballot.”
Id. at 155 (quoting Hill v. Milander, 72 So.2d 796, 798 (Fla.1954)). The Court further stated, “Simply put, the ballot must give the voter fair notice of the decision he must make.” Id. The Court added:
As it stands, subsection 8(e) precludes lobbying a former body or agency for two -years after-an affected' person leaves office. The ballot summary neglects to advise the public that there is presently a complete two-year ban on lobbying before one’s agency and, while it does require the filing of' financial disclosure before anyone may appear before any agency for the two years after leaving office, the .amendment’s chief effect is to abolish the present two-, year total prohibition. Although the summary indicates that the amendment is a restriction on one’s lobbying activities, .-the- amendment actually gives incumbent office holders, upon filing a financial- disclosure statement, a right to immediately commence lobbying before *228 their former agencies which is presently precluded. The problem, therefore, lies not with what the summary says, but, rather, with what it does not say.
Id. at 155-56 (footnote omitted). The same cannot be said for Mathésoñ’s case now before this Court. The purpose in Askew was to impose an immediate change. The referendum in that case was misleading because it appeared that it was increasing the prohibition, but in actuality, it was lessening the existing prohibition. In the case before us, the “chief purpose” of the referendum was to find out if at least two-thirds of the voters supported what was being asked in the referendum. However, there was no immediate change to anything after the results of the referendum were tallied. The only result was that the public, by an affirmative vote of more than two-thirds of the electorate, approved the proposed development at Crandon Park and the modification of agreements relating thereto. In addition, the ballot here did not try to accomplish the opposite of what the voters were being asked, which is what happened in Askew. As such, Askew is distinguishable.and does not support Matheson’s position.
Matheson also cites to Armstrong v. Harris, 773 So.2d 7 (Fla.2000), in support of his position that the ballot language is misleading by “hiding the ball” and “flying under false colors.” However, a review of Armstrong indicates that it, too, is distinguishable and does not support his position.
In Armstrong, a referendum was held wherein voters were asked to vote in favor of amending Florida’s Constitution to make it easier to impose the death penalty. Id. at 9-10. If the voters approved the amendment, the basis for imposing the death penalty would have changed immediately: Id. at 18. Just as in Askew, the ballot question in Armstrong was misleading because it concealed what the amendment did; The ballot question was trying to accomplish the opposite of what the voters were being asked. The chief purpose of the referendum in Armstrong was to change Florida’s Constitution. As previously discussed, that is not the case before us, so Armstrong is also inapplicable.
Matheson further cites to Wadhams v. Board of County Commissioners of Sarasota County, 567 So.2d 414 (Fla.1990). In that case, the Board of County Commissioners of Sarasota County' proposed amendments to the county charter concerning meetings of the county’s Charter Review Board. Id. at 415. The proposed amendments were approved by a majority of the voters. Id. Petitioners then filed a complaint challenging the amendment to the county charter, contending that the referendum failed to comply with section 101.161(1) because it did not provide a summary of the proposed changes. Id. The trial court did not invalidate the results of the referendum, and the Second District Court of Appeal affirmed, stating that “[t]he fact that a ballot may be confusing to some does not mandate a court to invalidate the results of an otherwise properly conducted election.” Id. (citations omitted).
The Florida Supreme Court disagreed and stated that the ballot in Wadhams had the same problem as the ballot in Askew. Wadhams, 567 So.2d at 416. The Court stated that the “chief purpose” of the referendum was not communicated to the voters:
By containing the entire section as it would actually appear subsequent to amendment, rather than a summary of the amendment to the section, the ballot arguably informed the voters that- the Charter Review Board would only be permitted to meet once every four years. By failing to contain an explanatory *229 statement of the amendment, however, the ballot failed to inform the public that there was presently no restriction on meetings and that the chief purpose of . the amendment was to curtail the Charter Review Board’s right to meet. Similar to the ballot summary at issue in Askew, the present ballot “is deceptive, because although it contains an absolutely true statement, it omits to state a material fact necessary in order to make the statement made not misleading.” Askew, 421 So.2d at 158 (Ehrlich, .J., concurring). The only way, a voter would know what changes were being effected by an affirmative vote on the ballot would be to know what section 2.11 of the county charter provided prior to amendment. As then Judge Grimes noted in his dissent below: “[T]here was nothing on the ballot to inform the voter of the change to be accomplished by the amendment, which is the very reason why section 101.161(1) requires an explanatory statement.” 501 So.2d at 124 (Grimes, J., dissenting). See also Kobrin v. Leahy, 528 So.2d 392 (Fla. 3d DCAXplacement on ballot of proposition to provide that the board of county commissioners shall be the governing board of the fire and rescue service district, but making no mention of the elimination of the existing governing body of the Fire and Rescue District, was misleading to voters and violated section 101.161(1), especially in light of simultaneously conducted election of persons to the existing governing board), review denied, 523 So.2d 577 (Fla.1988).
Id. at 416-17 (emphasis in original).
Again, the ballot question was misleading because it failed to include the explanatory statement required by section 101.161(1), and thus failed to inform the voters of the “chief purpose” of the measure. It told the voters that the Charter Review Board would only be permitted to meet once every four years, but failed to tell them that there was presently no restriction on meetings and-that-the chief purpose of the amendment was to curtail the Charter Review Board’s right 'to meet. In the facts of Matheson’s appeal, the referendum (which was just a few words shy of the sevénty-five word maximum requirement) included a reference to R-660-12, which had all the details of the existing structures expansion, as well as the details of the modification and extension of the existing agreements.
Similarly, Matheson’s reliance on this Court’s opinion in Miami-Dade County v. Village of Pinecrest, 994 So.2d 456 (Fla. 3d DCA 2008), is misplaced, as this case does not support his position; In Village of Pinecrest, Miami-Dade County presented a ballot question addressing the system by which fire and rescue services are provided to the citizens of Miami-Dade County. The ballot title and summary were the following:'
COUNTY CHARTER AMENDMENT CREATING UNIFORM COUNTYWIDE FIRE AND RESCUE SERVICE AND PRESERVING EXISTING ' CITY SERVICE
SHALL THE CHARTER BE AMENDED TO REQUIRE THAT THE BOARD OF COUNTY COMMISSIONERS .PROVIDE A UNIFORM, COUNTYWIDE SYSTEM OF FIRE PROTECTION AND RESCUE SERVICES FOR ALL INCORPORATED AND UNINCORPORATED AREAS OF. THE COUNTY WITH THE EXCEPTION OF THE CITIES OF MIAMI; MIAMI BEACH, HIALEAH, CORAL GABLES, AND KEY BISCAYNE WHICH MAY PROVIDE FOR FIRE AND RESCUE PROTECTION SERVICES WITHIN THOSE CITIES?
*230 Id. at 457-58 (emphasis in original). In Village of Pinecrest, the appellees claimed that the ballot title was misleading because it implied there previously did not exist a “uniform countywide fire and rescue service.” Id. at 458. The appellees further argued the ballot summary was misleading because it failed to advise voters that it curtailed their right to establish their own system. Id. The provision of the Charter which the appellees claimed the County fatally failed to mention in the ballot summary was the following:
SECTION 6.02 MUNICIPAL POWERS
Each municipality shall have the authority to exercise all powers relating to its local affairs not inconsistent with this charter. Each municipality may provide . for higher standards of zoning, service and regulation than those provided by the Board of County Commissioners in ..order that its individual character and standards may be preserved for citizens.
Miami-Dade County, Fla., Charter art. 6, § 6.02.'
This Court agreed with the Village of Pinecrest, stating:
This proposal does both. It “flies under false colors” of a title that promises to be “Creating [a] Uniform Countywide Fire and Rescue Service” when one has existed in Miami-Dade County for nearly thirty years, and “hides the ball” by purporting to. create new rights for the citizens while actually curtailing or eliminating existing rights.
Id. This is very different from the facts in the case before us'. The referendum in the case before us did not fail to mention anything. The referendum here did not allege that it created any new rights for citizens while actually doing the opposite and eliminating existing rights. The referendum at issue before us simply provided voters with detailed information regarding the Crandon Park expansion, consistent with Florida law and Article 7 of Miami-Dade County’s Home Rule Charter. ■
In 'sum, the referendum did not “hide the ball” or “fly under false colors.” Section 101.161, of the Florida Statutes, required that IPC and Miami-Dade County tell the voters, in clear and unambiguous language, the chief purpose of the referendum.' And the referendum did just that. The referendum language was clear and unambiguous and not misleading. It informed the voters of its chief purpose, which was to find out whether at least two-thirds of the voters supported 1). the “[ejection of permanent structures and the expansion of existing structures at Crandon Park Tennis Center for public park and tennis tournament use, which [would] be funded solely by tennis center and tournament revenues and private funds; and 2) the [mjodification and extension of agreements with the operator of the Sony Open Tennis Tournament or its successors”. The referendum did not change in any way the procedure for amending the Crandon Park Master Plan. The referendum language complied with Article 7 of Miami-Dade County’s Home Rule Charter and section 101.161(1), Florida Statutes (2012). Accordingly, we affirm the trial court’s Final Judgment.
Affirmed.
EMAS, J., concurs.

. This Court did hold, however, that the operation of the Lipton tournament violated the deed restriction because it deprived the public “of the use and enjoyment of Crandon Park, including the use and enjoyment of the tennis facilities.” Id. at 124, This Court reasoned Aat because the public is deprived of using the facilities for three to four weeks during the tournament period, the operation of the Lipton tournament amounted “to the virtual ouster of the public from the pa'rk" during the tournament. White, 563 So.2d at 125.

. There is evidence in the record that the Master Plan has been previously amended. In December 2013, the Director of the Miami-Dade Parks, Recreation and Open Spaces Department at the time, Mr. Jack Kardys, stated in his affidavit that the Master Plan has been amended several times over the years, including with respect to the Crandon Park Tennis Center. The following is a list of the amendments he listed in his affidavit: 1) On October 22, 2002, the BOCC approved an amendment to the Master Plan to.allow the temporary seating for the Sony Open Tennis Tournament to be stored on the upper deck of the Tennis Stadium at Crandon Park; This amendment was approved by the Amendment Committee on November 12, 2002; 2) On October 22, 2002, the BOCC approved an amendment to the Master Plan to allow the already existing lighted ball fields to remain at Crandon Park permanently rather than being removed by January 1, 2005, as specified in the Master Plan, On May 4, 2005, the Amendment Committee" approved the amendment to allow the lighted ball fields to remain beyond 2005 but for only an additional eight years, or until 2013; 3) On October 22, 2002, the BOCC approved an 'amendment "to the Master Plan to allow existing boat dry storage facility at the Crandon Park Marina for 130 boats to remain instead of being reduced to 20 boats, as required by the Master Plan. ■On November 12, 2002, the Amendment Committee approved the.amendment; 4) On December 16, 2003, the BOCC approved an amendment to the Master Plan to allow the construction of a marina dive shop larger - than that permitted by the Master Plan and to allow additional uses .for that marina dive shop beyond those permitted by the Master Plan. On December 7, 2004, the Amendment Committee approved the amendments to the Master Plan to allow expanded size and uses ‘ of the marina dive shop; 5) On April 5, 2005, the BOCC approved an amendment to the Master Plan to allow the expansion and modifications of utilities infrastructures at Cran- ■ don Park to account for increased demand and technological upgrades. On' February 15, 2007, the Amendment Committee approved the expansion and modifications of utilities infrastructure sought by BellSouth; 6) On March 15, 2011, the BOCC approved an amendment to the Master Plan to eliminate restrictions on the exit and traffic circulation at the Crandon Park Marina and to allow a permanent awning to replace the fabric awning at the marina. The Amendment Committee approved this amendment on May 4, 2011.