EMAS, J.,
concurring.
I concur in affirming the final judgment below, and write to further explain my reasons.
Although our standard of review is de novo, such review is tempered by the “strong public policy against courts interfering in the democratic processes of elections.” Let Miami Beach Decide v. City of *231 Miami Beach, 120 So.3d 1282 (Fla. 3d DCA 2013) (quoting Fla. League of Cities v. Smith, 607 So.2d 397, 400 (Fla.1992)). Therefore, “[a] court may declare a proposed ... amendment invalid only if the record shows that the proposal is clearly and conclusively defective.” O’Connell v. Martin Cnty., 84 So.3d 463, 465 (Fla. 4th DCA 2012) (quoting Armstrong v. Harris, 773 So.2d 7, 11 (Fla.2000)).
I agree that the language of the ball.ot summary informed the voters of the “chief purpose” of the referendum without “flying under false colors” or “hiding the ball,” thus satisfying section 101.161, which requires that “the voter have notice of that which he must decide.... What the law requires is that the ballot be fair and advise thé voter sufficiently to enable him intelligently to cast his ballot.” Armstrong, 773 So.2d at 13 (quoting Askew, 421 So.2d 151, 154-55 (Fla.1982)).
Determining the “chief purpose” of the referendum requires us to look to the reason why the ■ ballot question was placed before the voters in the first place. Contrary to Matheson’s position, the referendum was not intended to (and in fact could not) modify, alter or amend the previously-created Crandon Park Master Plan,-the Declaration of Restrictive Covenants, the Final Judgment or the Settlement Agreement. Rather, the referendum was intended to comply with the requirements of Article 7 of the Charter of Miami-Dade County. Article 7.01 sets forth a policy that states in pertinent part:
Parks ... and lands acquired by the Count for preservation shall be held in trust for the education,. pleasure, and recreation of the public and they shall be used and maintained in a manner which will leave them unimpaired for- the enjoyment of future generations as a part of the public’s irreplaceable heritage.
Article 7.02 provides restrictions for the use of public parks and requires a majority vote of the electorate before certain commercial uses may be made. It provides the following general restriction:
In furtherance of this policy parks shall be used for public park purposes only, and subject to the limited exceptions set forth in this. Article, there shall be no permanent structures or private commercial advertising erected in a public park or private commercial use of a public park or renewals, expansions, or extension of existing leases, licenses, or concessions to private parties of public park property, unless, each such structure, lease, license, renewal, expansion, extension, concession or use shall be approved by a majority vote of the voters in a County-wide referendum..
In addition, Article 7.02 creates a special class of public parks (which includes Cran-don Park), and imposes the heightened requirement of a two-thirds vote of the electorate before certain commercial uses may be made for this class of parks:
To ensure aquatic preserves, lands acquired by the County for preservation, and public parks or parts thereof which are nature preserves, beaches, .natural forest areas, historic or archeological areas, or otherwise possess unique natural values in their present state, such as ... Crandon Park, ... and all other natural or historical resource based parks do not lose their natural or historical values, any structure, lease, license,. renewal, extension, concession or use in any of this class of public parks or in aquatic preserves and preservation lands must be approved by an affirmative vote of two-thirds of the voters in a County-wide referendum. (Emphasis added.)
Given this backdrop, it is clear that the “chief purpose” of the referendum was to comply with the Charter’s requirement *232 that two-thirds of Miami-Dade voters approve any proposed expansion of the facilities in Crandon Park. The chief purpose of the referendum was decidedly not to determine whether Miami-Dade voters wished to amend the Crandon Park Master Plan, the Declaration of Restrictive Covenants, the Final Judgment, or the Settlement Agreement. In point of fact, no vote of Miami-Dade citizens would or could have effectuated any such amendments; under the express terms of the Settlement Agreement, the only manner in which the Crandon Park Master Plan could be amended was by a majority vote of the Miami-Dade County Board of Commissioners, together with a majority vote of the Committee on Amendment of the Crandon Park Master Plan. This amendment process did not require-any vote of the electorate. Therefore, under the circumstances presented, the “chief purpose” of the vote was simply a mandated referendum to determine whether two-thirds of the Miami-Dade County electorate wished to permit the proposed expansion of the facilities.,
Matheson’s reliance on Askew and Armstrong is misplaced. Each of those cases involved a vote which, in and of itself, effectuated a change to the existing provisions of the state constitution. In Armstrong, the ballot summary misled the voters because it' created the impression that the proposed amendatory language would provide greater constitutional protection when in reality it accomplished the opposite:
[A] citizen could well have voted in favor .of the proposed amendment thinking that he or she was protecting state constitutional rights when in fact the citizen was doing the exact opposite i.e., he or she' was voting to nullify those rights.
Armstrong, 773 So.2d at 18.
Similarly, Askew involved a proposed amendment which purported to strengthen Florida’s constitutional restrictions on lobbying activities. However, the actual effect of the proposed amendment was to weaken the existing constitutional provision:
As it stands, [the existing constitutional provision] precludes lobbying a former body or agency for two years after an affected person leaves office. The ballot summary neglects to advise the public that there is presently a complete two-year ban on lobbying before one’s agency and, while it does require the filing of financial disclosure before anyone may appear before any agency for the two years, after leaving office, the amendment’s chief effect is to abolish the present two-year total prohibition. Although the summary indicates that the amendment is a restriction on one’s lobbying activities, the amendment actually gives incumbent office holders, upon filing a financial disclosure statement, a right to immediately commence lobbying before their former agencies which is presently precluded. The problem, therefore, lies ■not with what the summary says, but, rather, -with what it does not say.
Askew, 421 So.2d at 155-56 (footnote omitted).-
The distinction between Askew and the instant case is underscored by the following observation in Askew:
Had [the ballot proposal] not been an amendment to an existing provision, if it had been a totally new provision, its ■ballot summary and title would probably have been permissible. The change to subsection 8(e) [of Article II of the Constitution] is as .stated, but the stated change is only incidental to the true purpose and meaning of section 8 in its entirety. Public financial disclosure is needed-to assure the accountability of *233 state officers and is the heart of' section 8. But, in subsection (e), section 8 also expresses another vital concern — the ban on lobbying. The ballot summary fails to give fair notice of an exception to ■ a present prohibition.
Id, at 156.
Matheson attempts to portray the referendum in the instant case as an amendment to the Crandon Park Master Plan. But it is not. Unlike the referenda in Armstrong and Askew, passage of this referendum did not amend, modify or alter anything. . It is the legal equivalent of “a totally new provision” as described in Askew. And unlike the summaries' in Armstrong and Askew, no material ramifications were left undisclosed in the instant case, nor did the ballot language fail to apprise the voters of the “full sweep” of the proposal. Rather, it adequately informed the voters of the sweep, effect, and ramification of the referendum. The electorate’s approval of the referendum did not impact the Crandon Park Master Plan, and did not, on its own, permit the County or any private entity to erect permanent structures, expand existing structures, or extend or modify agreements with the operator of the tennis tournament. It was certainly not necessary to advise voters that no such expansion could take place without an amendment to the Crandon Park Master Plan. The fact that the terms of the Crandon Plan Master Plan currently prohibited such expansion was not material, as the voters were not asked to amend the Crandon Park Master Plan.
In the instant case, because the referendum did not effectuate any change beyond complying with the Charter-mandated procedure for approving “any structure, lease, license, renewal, extension, concession or use” in the class of public parks that included Crandon Park, it satisfied the requirement that it place “the voter on notice of that which he must decide” and “advise the voter sufficiently to enable him intelligently to cast his ballot,” Armstrong, 773 So.2d at 13.
I therefore concur in affirming the judgment of the trial court.