IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

FLORIDA ASSOCIATION OF REALTORS
D/B/A FLORIDA REALTORS AND FLORIDA
APARTMENT ASSOCIATION, INC.,

      Appellants/Cross-Appellees,

  v.

Case No.  5D22-2277
LT Case No. 2022-CA-007552-O

ORANGE COUNTY, FLORIDA

      Appellee/Cross-Appellant,

AND

BILL COWLES, IN HIS OFFICIAL CAPACITY
AS ORANGE COUNTY SUPERVISOR OF
ELECTIONS,

      Appellee.

_____/

Opinion filed October 27, 2022

Nonfinal Appeal from the Circuit Court
for Orange County,
Jeffrey L. Ashton, Judge.

Scott A. Glass and Erik F. Szabo, of Shutts &
Bowen LLP, Orlando, and Daniel E. Nordby,
Benjamin Gibson, and Eric Yesner, of Shutts &

Bowen LLP, Tallahassee, for Appellants/Cross-Appellees.

Matthew J. Conigliaro, of Carlton Fields, P.A., Tampa, Amicus Curiae, for National Association of Realtors, for Appellants/Cross-Appellees.

Carly J. Schrader, Gregory T. Stewart, Elizabeth Desloge Ellis, and Kirsten H. Mood, of Nabors, Giblin & Nickerson, P.A., and Dylan Schott and Jeffrey J. Newton, of Orange County Attorney's Office, for Appellee/Cross-Appellant, Orange County, Florida.

Nicholas A. Shannin and Carol B. Shannin, of Shannin Law Firm, P.A., Orlando, for Appellee, Bill Cowles, in his Official Capacity as Orange County Supervisor of Elections.

TRAVER, J.

Florida Association of Realtors and Florida Apartment Association, Inc. (collectively, "the Association") and Orange County, Florida ("the County") both appeal the trial court's non-final order denying the Association's motion for temporary injunction to enjoin the County and the Orange County Supervisor of Elections Bill Cowles from implementing and enforcing the contents of a rent control ordinance. We have jurisdiction. *See* Fla. R. App. P. 9.130(a)(3)(B). The trial court correctly concluded that the Association had a substantial likelihood of success on the merits of its two-pronged challenge to the County's rent control ordinance and the corresponding ballot summary. But it erred by allowing the matter to remain on the ballot for the

2

people of Orange County to vote on an unconstitutional ordinance described by a misleading ballot summary. We therefore reverse the trial court's denial of the Association's motion for temporary injunction and remand this matter for its immediate entry.

## I.    Overview

Before we discuss the factual background of this matter, some discussion of the Florida Constitution and the specific law involved in this case is appropriate. The Florida Constitution "is the paramount expression of the law by the people of this State." *See N. Fla. Women's Health & Counseling Servs., Inc. v. State*, 866 So. 2d 612, 658 (Fla. 2003) (Quince, J., concurring). Accordingly, if a law is inconsistent with our constitution, it must fail. *See Holley v. Adams*, 238 So. 2d 401, 405 (Fla. 1970).

Florida counties that operate under county charters—like the one in this case—have the power of self-government. *See* Art. 8, § 1(g), Fla. Const. But the Florida Constitution limits this power. For example, local governments cannot pass an ordinance that is inconsistent with general and special laws enacted by the Florida Legislature. *See id.* Such an ordinance, by its nature, would be unconstitutional.

In 1977, the Florida Legislature passed a law limiting the ability of local governments to pass any measure imposing "controls on rents." *See* §

3

125.0103(2), Fla. Stat. (1977). This law remains in effect today, and it sets an extremely high bar if a local government wishes to pass a rent control measure. First, if a local government wants to impose rent controls, it must find and determine "that such controls are necessary and proper to eliminate an existing housing emergency which is so grave as to constitute a serious menace to the general public." *Id.* Second, any such measure may not be imposed for longer than one year. *Id.* § 125.0103(3). Third, certain types of properties, like second homes, are completely exempted from rent controls. *Id.* § 125.0103(4).

The law also requires a regimented process before a local government can pass a rent control ordinance. *Id.* § 125.0103(5). The local government's governing body must duly adopt the ordinance after notice and public hearing. *Id.* § 125.0103(5)(a). In the resulting ordinance, the local government must recite "its findings establishing the existence in fact of a housing emergency so grave as to constitute a serious menace to the general public and that such controls are necessary and proper to eliminate such grave housing emergency." *Id.* § 125.0103(5)(b). Finally, the local government's voters must approve the measure. *Id.* § 125.0103(5)(c). If the ordinance is ever challenged in court, the local government bears the burden of upholding its validity. *Id.* § 125.0103(6). So, in this case, the County must

4

establish that its rent control ordinance is valid, even though the Association sued to enjoin its place on the ballot and its ultimate enforcement. With that overview, we turn to the matter at hand.

## II.    Background

In April 2022, the County Commission discussed a proposal from one of its commissioners to enact a rent control measure. Thereafter, the County hired Community Solutions Group of GAI Consultants, Inc. ("GAI") to evaluate county housing costs and the effectiveness of rent control measures. Specifically, the County asked GAI to: 1) evaluate and document local housing conditions to determine whether they rise to the level of a housing emergency; 2) estimate the number of units that could be affected by rent control measures; and 3) comment on the likely effectiveness of those measures if implemented.

In June 2022, GAI presented its findings at a public meeting. GAI concluded that Orange County faced several pressing challenges relating to housing. For example, its population was growing, its housing inventory was falling, and its prices were increasing—all beyond historic levels. In addition, rents rose more than 25% from 2020 to 2021, and rental vacancy rates were at 5.2%, the lowest since 2000. GAI noted that rents were "spiking," and that Orange County's least affluent citizens bore a disproportionate resulting

5

burden. It recognized that a significant portion of Orange County's population was spending a large percentage of income on housing costs.

But the County's hired consultant did not find a "housing emergency," which we have explained is one of several mandatory findings necessary for a local government to impose rent controls. GAI concluded that the issues driving rising housing costs in Orange County were "deeply structural and a product of regional and national market influences, likely beyond the control of local regulation," stemming mostly from "inadequate housing production over years which a temporary rent ceiling would do little to correct." GAI opined that if the County passed such a measure, it "may impede the objective of speeding overall housing deliveries as well as create a number of unintended consequences," rather than fulfilling its goal of eliminating a housing crisis. Instead, GAI recommended a well-funded, continuing, and comprehensive strategic approach to address these concerns. After this presentation, GAI had no further participation in the legislative process.

The County Mayor also directed the County Attorney to prepare an advisory legal opinion on the issues surrounding rent control ordinances in Florida. The County Attorney advised that Florida law imposed strict limits on the County's ability to enact such a measure, and that it was "unlikely that

6

findings of an increase in the cost of living or inflation alone will be sufficient to meet the requirements of [section 125.0103, Florida Statutes]."

The County held three additional meetings to consider additional information that would ultimately inform the findings in its rent control ordinance. This additional information included data about evictions and home sale costs. The County also entertained public comment.

In August 2022, following a public meeting, the County adopted Ordinance 2022-29 ("the Ordinance") by a 3–2 vote. As required by section 125.0103(5)(b), the Ordinance listed findings supporting its contention that a housing emergency existed in Orange County "so grave as to constitute a serious menace to the general public and that such controls are necessary and proper to eliminate such grave housing emergency."

Specifically, the Ordinance described a housing shortage of 26,500 units in Orange County, and a population increase of 25% from 2010 to 2020. It noted that 39% of the housing units in Orange County are occupied by renters, and the current 5.2% rental vacancy rate is the lowest since 2000. It declared that "inflation, housing prices, and rental rates in Orange County are increasing, accelerating, and spiraling," citing a 43% increase in median home sales price from May 2020 to May 2022 and a 25% increase in asking rent per unit from 2020 to 2021, the highest increase since 2006 when it was

7

6.7%.  It recited that 80.3% of households earning at or below the average median income in Orange County pay more than 30% of their household income for housing and may have difficulty affording other life necessities such as food, clothing, transportation, and medical care.  It stated that Orange County has been in a housing crisis since before the pandemic. But the pandemic had worsened the housing crisis; the State awarded Orange County the most funds from its now-ended COVID-19 emergency rental assistance program, and the housing conditions continue to deteriorate. Finally, it disclosed 6,970 eviction case filings in the first half of 2022, a 70.1% increase over the same period in 2021.

To eliminate this stated housing emergency, the Ordinance outlined a rent control measure limiting the frequency and amount of rent increases. First, it would prevent any landlord from demanding, charging, or accepting a rent increase from a residential tenant more than once in a twelve-month period.  Second, it would preclude any landlord from demanding, charging, or accepting a rent increase on any residential unit greater than the existing rent multiplied by the Consumer Price Index.  The Ordinance also includes a process by which landlords can request exceptions to receive a fair and reasonable return on investment and lists factors for deviations from the limitation on rent increases.  Likewise, it provides several exemptions,

including those required by various state and federal statutes. The Ordinance further provides for civil and criminal enforcement pursuant to existing Florida law: a landlord who violates it is subject to potential civil citations and fines imposed by the County's code enforcement board of up to $15,000 per violation, and potential criminal prosecution resulting in a fine up to $500 and 60 days in jail.

Finally, as section 125.0103(5)(c) requires, the Ordinance provides that it will be placed on the ballot of the November 2022 general election for consideration and action by the Orange County electorate. The Ordinance contains the following ballot title and summary statement:

**Rent Stabilization Ordinance to**
**Limit Rent Increase for Certain**
**Residential Rental Units**

Shall the Orange County Rent Stabilization Ordinance, which limits rent increases for certain residential rental units in multifamily structures to the average annual increase in the Consumer Price Index, and requires the County to create a process for landlords to request an exception to the limitation on the rent increase based on an opportunity to receive a fair and reasonable return on investment, be approved for a period of one year?

Six days later, the Association sued the County to declare the Ordinance unconstitutional and the ballot summary invalid. The Association also sought injunctive relief preventing the County from enforcing the Ordinance and preventing the Orange County Supervisor of Elections from

9

conducting or certifying the November 2022 referendum election. In September 2022, the Association moved for a temporary injunction seeking this relief, and both sides filed detailed legal memoranda supporting their positions. The trial court quickly convened a five-hour evidentiary hearing, at which the Association and the County called witnesses, introduced exhibits, and made legal arguments. The Supervisor of Elections also explained potential ways in which he could implement an order directing removal of the issue from the ballot.

In its prompt and detailed order, the trial court denied the Association's request for a temporary injunction. But it concluded that the Association had a substantial likelihood of succeeding in its challenges against the Ordinance and the ballot summary. In support of this conclusion, the trial court recognized that section 125.0103(5)(b) required the County to make findings supporting the existence of a housing emergency. It found that the County's findings fell short of this high bar. It further acknowledged that a ballot summary cannot mislead on a proposed law's true effect. The trial court determined the ballot summary was misleading because it did not include potential criminal penalties for landlords who violated the Ordinance.

The trial court rationalized its decision to leave the initiative on the ballot even though it was likely doomed to ultimate failure for three reasons.

First, it reasoned that nobody would suffer any harm if the voters rejected the Ordinance at the polls. Second, it explained that even if the Ordinance passed, aggrieved landlords could fight its enforcement and appeal any adverse ruling. Third, it noted that a temporary injunction would not serve the public interest. The trial court observed that even though the County had advanced an initiative that violated the law, there was value in allowing the public to "exercise their right to express their opinion on this issue, even if that is all it will ever be, an opinion."

Both the Association and the County appealed the trial court's order denying the temporary injunction. We expedited briefing in this case due to the upcoming election. The Association suggests that the trial court erred by denying its request for temporary injunctive relief. The County takes no issue with the denial, but it disputes the trial court's conclusion that it will likely not succeed in upholding the Ordinance or defending the ballot summary. The Association is correct.

## III. Standard of Review

We review the trial court's denial of the Association's motion for temporary injunction in a "hybrid" manner. *See Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1258 (Fla. 2017) (citations omitted). We give great deference to its factual findings, evaluating them for an abuse of

11

discretion. *See id.* A trial court only abuses its discretion if no reasonable person could adopt its view. *See Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980). By contrast, we examine the trial court's legal conclusions de novo, which means that we review it anew, as if it had never been heard before. *See Gainesville Woman Care, LLC*, 210 So. 3d at 1258; *Lee v. St. Johns Cnty. Bd. of Cnty. Comm'rs*, 776 So. 2d 1110, 1113 (Fla. 5th DCA 2001).

The Florida Supreme Court has imposed a four-part test on the issuance of a temporary injunction. *See Naegele Outdoor Advert. Co. v. City of Jacksonville*, 659 So. 2d 1046, 1047 (Fla. 1995). To obtain this relief, the party seeking it must establish: 1) a substantial likelihood of success on the merits; 2) the likelihood of irreparable harm; 3) the lack of an adequate legal remedy; and 4) that the public interest supports the injunction. *Id.* The injunction's proponent must establish each element with competent substantial evidence. *See Concerned Citizens for Jud. Fairness, Inc. v. Yacucci*, 162 So. 3d 68, 72 (Fla. 4th DCA 2014). If any element is missing, a trial court cannot enter an injunction. *See Fla. Dep't of Health v. Florigrown, LLC*, 317 So. 3d 1101, 1111 (Fla. 2021).

The trial court properly applied this four-part test, also correctly identifying that the County had the burden to establish the Ordinance's

12

validity. See § 125.0103(6). Indeed, the parties do not dispute the trial court's methodology, only its factual findings and legal conclusions. We assess these findings and conclusions for both the Association's request to enjoin the Ordinance's enforcement and to remove the question of its adoption from the ballot, discussing the four-part test for each issue.

## IV. Analysis

The trial court correctly concluded that the Association was substantially likely to succeed on the merits of its claims against the Ordinance and the ballot summary. By contrast, we find that the trial court erred in determining that the Association did not suffer irreparable harm, it had an adequate remedy at law, and the public interest supported a public vote on a misleading ballot summary of an unconstitutional ordinance.

### 1. Likelihood of Success on the Merits

To establish a substantial likelihood of success on the merits of its claims, the Association had to advance more than just a colorable claim. *See Scott v. Trotti*, 283 So. 3d 340, 343 (Fla. 1st DCA 2018). Instead, it must illustrate "a clear legal right to relief requested." *See Mid–Fla. at Eustis, Inc. v. Griffin*, 521 So. 2d 357, 357 (Fla. 5th DCA 1988). The Association easily meets this standard for both its challenges.

13

a.  *The Ordinance*

First, the trial court properly determined the Association is likely to succeed on the merits of its claim that the Ordinance is facially invalid under section 125.0103, Florida Statutes, and Article VIII, § 1(g) of the Florida Constitution.  As we discussed at the outset of this opinion, the County has "all powers of local self-government not inconsistent with general law."  *See* Art. VIII, § 1(g), Fla. Const.  Our constitutional structure therefore empowers the County to enact ordinances provided they are "not inconsistent with general law."  In other words, the County may legislate in areas in which the Florida Legislature has not "preempted" its authority.

We begin our analysis of this issue by examining the law in question. Originally enacted in 1977, section 125.0103(2) currently outlines three significant requirements before a county may adopt a rent control measure:

> No law, ordinance, rule, or other measure which would have the effect of imposing controls on rents shall be adopted or maintained in effect except as provided herein and unless it is found and determined, as hereinafter provided, that such controls are *necessary and proper to eliminate* an *existing housing emergency* which is *so grave as to constitute a serious menace to the general public*.

(Emphasis added).

As illustrated, this statute requires the County to prove the "existence in fact" of its adopted legislative findings establishing: 1) a "housing

14

emergency"; 2) that is "so grave as to constitute a serious menace to the general public"; and 3) that the proposed rent control measures are both "necessary" and "proper" to "eliminate" the grave housing emergency.  *See* § 125.0103(2), (5)(b), (6).  By examining each of the statute's requirements, we conclude that the Ordinance fails to identify or support any one of these three requirements.

i.     "[H]ousing emergency."

First, the Ordinance's findings do not illustrate "an existing housing emergency," as is required by section 125.0103(2) and (5)(b).  We note that the statute does not define "housing emergency," but we can ascertain its meaning by considering its plain and ordinary public meaning at the time of enactment.  In doing so, we must consider the term in context, "'exhaust[ing] all the textual and structural clues' that bear on the meaning of a disputed text."  *Conage v. United States*, 47 Fla. L. Weekly S199, S200 (Fla. Aug. 25, 2022) (quoting *Alachua Cnty. v. Watson*, 333 So. 3d 162, 169 (Fla. 2022)).

Typically, the best evidence of what a contested term meant when enacted comes from a dictionary published close to that time.  *Id.* at S201.  And here, dictionaries demonstrate that an "emergency" was commonly understood to mean "an unforeseen combination of circumstances or the resulting state that calls for immediate action."  *Emergency*, *Webster's*

15

*Seventh New Collegiate Dictionary* (1967); *Emergency*, *Webster's Third New International Dictionary* (1961).[1]

The context in which the statute uses "housing emergency" provides additional clues to its meaning. Indeed, the Florida Supreme Court discussed and defined a "housing emergency" before the Florida Legislature adopted the term in 1977. Specifically, in evaluating multiple cases from the United States Supreme Court, the Florida Supreme Court concluded that an emergency was "[t]he only justification" for a rent control measure. *City of Miami Beach v. Fleetwood Hotel, Inc.*, 261 So. 2d 801, 804 (Fla. 1972). The *Fleetwood* Court noted that "emergency" had "been narrowly defined" in this context. *Id.* It declared that "[a]n increase in the cost of living (an inflationary spiral) alone is not a justification for rent control legislation which limits the amount of rent which a tenant may be required to pay." *Id.* In other words, "[t]he mere inability by a group of tenants to meet rent payments is not such

---

[1] We review dictionaries published close to the time of enactment because sometimes a word's usage evolves or changes. For example, depending on the context, "spam" might or might not mean something completely different now than it did fifty years ago. Here, "emergency" has the same definition today as it did in 1977. *See Emergency*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/ emergency (defining "emergency" as "an unforeseen combination of circumstances or the resulting state that calls for immediate action"). The dictionary definitions of the other terms we define in this opinion also have not changed.

an emergency as to justify government controls which are suitable to that group of tenants but which would render investments in housing projects far less attractive and in some instances lead to bankruptcy." *City of Miami Beach v. Forte Towers, Inc.*, 305 So. 2d 764, 771–72 (Fla. 1974) (Roberts, J., concurring in part and dissenting in part).

Given this precedent, we may reasonably conclude that the Legislature's use of "emergency" in section 125.0103(2) and (5)(b) carried a similar meaning, especially considering the United State Supreme Court's admonition that rent control legislation was only permitted in the face of an "emergency." *See, e.g.*, *Conage*, 47 Fla. L. Weekly at S201 (noting that existing precedent would inform reader of legislature's work product, and legislature itself, as to meaning of term).

Section 125.0103's structure provides further evidence as to the scope of the term "housing emergency." Section 125.0103(3) provides that any rent control ordinance "shall terminate and expire within 1 year" and cannot be extended unless the county adopts a new measure meeting all of section 125.0103's requirements.

Considering the ordinary meaning of the term "housing emergency" in context, we conclude—as the trial court did—that the type of housing emergency contemplated by section 125.0103 is sudden or unexpected,

creating a temporary condition necessitating immediate or quick action. A decision otherwise would require us to overlook the background in which the term was adopted, dispense with dictionary definitions, and disregard the structure of section 125.0103, which contemplates only a year-long enactment.

The legislative findings in the Ordinance contradict the ordinary meaning of "housing emergency" as used in this context. The Ordinance's findings, which cite population increases over the past decade, longstanding housing shortages, and a study finding an affordable housing crisis in May 2018, primarily refer to historical structural issues rather than a "sudden" or "unexpected" occurrence. Other findings addressed more recent circumstances, like the COVID-19 pandemic worsening the housing crisis, resulting in spiraling inflation, housing prices, and rental rates. But the Florida Supreme Court has held that an "increase in the cost of living (an inflationary spiral) alone is not a justification for rent control legislation." *Fleetwood Hotel*, 261 So. 2d at 804. The County Attorney warned the County that these factors would be legally insufficient before it enacted the Ordinance.

The County suggests that structural issues that are not an emergency can reach a "tipping point" that makes them one. But the trial court found

18

otherwise, which is supported by the testimony of Dr. Owen Beitsch, the leader of GAI's consulting team. In testifying for the Association at the temporary injunction hearing, Dr. Beitsch opined that numerous other market conditions and social indicators in Orange County belied this point. These include a low unemployment rate, high rental occupancy, a high home sale rate, and the regular retirement of stably paid workers.

Ultimately, in applying the ordinary meaning of a "housing emergency," as understood in the context of section 125.0103, we conclude that Orange County cannot prove the "existence in fact" of a "housing emergency" sufficient to justify the Ordinance under section 125.0103(2) and 5(b). Accordingly, the trial court correctly determined that the Association is substantially likely to succeed on the merits of its challenge to the Ordinance's validity.

ii. "[S]o grave as to constitute a serious menace to the general public."

Even if the County could prove the existence of a "housing emergency," section 125.0103 requires another showing it cannot make. Specifically, the statute also requires that emergency be "so grave as to constitute a serious menace to the general public." § 125.0103(2), (5)(b). The terms in this phrase are also undefined, so we again consider the ordinary meaning of the terms in context.

19

"Menace," used as a noun, generally means someone or something that represents a threat or danger. *See Menace*, *Webster's Seventh New Collegiate Dictionary* (1967); *Menace*, *Webster's Third New International Dictionary* (1961). "Public" generally means the people as a whole, populace, or masses. *See Public*, *Webster's Seventh New Collegiate Dictionary* (1967); *Public*, *Webster's Third New International Dictionary* (1961). Taken together, the statute requires that the County demonstrate a housing emergency that constitutes a grave threat or danger to the Orange County citizens *as a whole*.

We again find support for this interpretation in precedent. The United State Supreme Court determined that states had the authority to limit rents based upon the justification of "a social emergency." *Edgar A. Levy Leasing Co. v. Siegel*, 258 U.S. 242, 245 (1922). The *Levy* Court described this as an emergency that was not only caused by "an insufficient supply of dwelling houses and apartments," but one that was "so grave that it constituted a serious menace to the health, morality, comfort, and even to the peace *of a large part of the people of the state*." *Id.* (emphasis added). In *Levy*, the State of New York cited numerous conditions that affected a large part of its populace. *Id*. at 245–46. These included a shortage of housing that was causing "widespread distress"; rent profiteering so oppressive and flagrant

20

that it amounted to extortion; never-before-seen abuse of legal process solely for the purpose of increasing rents; and a crisis of multi-family living situations in apartments adequate for only one family. These conditions, the evidence supported, were causing overcrowding and "insanitary conditions, disease, immorality, discomfort, and widespread social discontent." *Id.*

Here, the County's legislative findings are virtually devoid of findings that the allegedly existing housing emergency is "so grave as to constitute a serious menace to the general public." § 125.0103(2). At most, the County cites to a low rental vacancy rate and low availability of affordable housing. Both the trial court's order and its questioning of Dr. Beitsch at the evidentiary hearing demonstrates it was properly focused on this issue. In response to the trial court's questions, Dr. Beitsch testified that there was no evidence that rents had become so high that "essential workers couldn't afford to live and work in this community." He explained that he found no evidence that the homeless population had become so great that it "overwhelmed public services" and "the general public didn't have access." He concluded there was no evidence that the "rent issue" poses any danger to "people who aren't renters themselves." While we do not minimize the evidence supporting a complex, multifaceted housing issue affecting *renters* in Orange County, it was insufficient under the law to support a rent control measure. These are

21

not the sort of factors the United States Supreme Court described in *Levy*, nor do they establish any sort of grave threat or danger to the people *as a whole*, as contemplated by section 125.0103.

Therefore, applying the ordinary meaning of "so grave as to constitute a serious menace to the general public" as understood in the context of section 125.0103, we conclude that Orange County cannot meet the statute's requirements, even if it were to establish a "housing emergency." The trial court correctly determined that the Association is substantially likely to succeed on the merits of its challenge to the Ordinance's validity in this aspect as well.

### iii. "[N]ecessary" and "proper" to "eliminate" any grave housing emergency.

A final and significant aspect of section 125.0103 further demonstrates the Ordinance's invalidity. Section 125.0103 states that even if there is a "housing emergency," and even if it is "so grave as to constitute a serious menace to the general public," counties still must demonstrate that the ordinance is "necessary and proper to eliminate such grave housing emergency." § 125.0103(5)(b).

Dictionaries published close in time to the legislative enactment illuminate the ordinary meaning of the word "eliminate," demonstrating it means to "get rid of," expel, or eradicate. *Eliminate*, *Webster's Seventh New*

22

*Collegiate Dictionary* (1967); *Eliminate*, *Webster's Third New International Dictionary* (1961). The County suggests we should not view "eliminate" in this manner because it contemplates an "impossible standard." Instead, it effectively suggests we view "eliminate" as synonymous with terms "ameliorate," "lessen," or "mitigate."

We cannot accept this suggestion for at least three reasons. First, "eliminate" does not and has never meant this. The County's legislative findings do not even suggest that the Ordinance will "eliminate" a housing emergency in Orange County. Second, the trial court received competent, substantial evidence showing the opposite. Dr. Beitsch testified that rent control measures are "not likely to have much of an effect on rental conditions in the market." GAI's report, admitted into evidence without objection, concluded that rent control measures may actually hurt rental conditions by "imped[ing] the objective of speeding overall housing deliveries as well as creat[ing] a number of unintended consequences." Third, and perhaps most importantly, the County's inability to demonstrate this factor illustrates the difference between a housing crisis based on long-term systemic factors, some of which may not be unique to Orange County, and a housing emergency that a rent control measure may eliminate. The County urges us to ignore the extremely high bar section 125.0103 imposes to allow

23

enforcement of a rent control measure that may potentially make a housing shortage worse. In sum, for this third and independent reason, the trial court correctly concluded that the Association satisfied its burden to demonstrate a substantial likelihood of success on the merits of its challenge to the Ordinance's validity.[2]

b. *The Ballot Summary*

The trial court also correctly ruled the Association was likely to succeed on its ballot summary claim, although not for the reason it found.[3] The ballot

---

[2] We reject the County's complaint that the trial court improperly excluded most of its expert testimony at the injunction hearing. The trial court did not err in doing so, reasoning that the County did not have the benefit of the information when it enacted the Ordinance. This information could not have informed the County's mandated legislative findings because it did not know the information existed. *See* § 125.0103(5)(b).

But even if this testimony had informed the County's legislative findings, or if the County could introduce this information at trial, it would make no difference. This reflects just one of the many elements that make section 125.0103 a unique and distinct statute. To satisfy it, the County had to outline specific facts—in the form of legislative findings in the Ordinance— that supported its contention that it met all three of the significant requirements set forth in section 125.0103(5)(b). Because we conclude that these findings did not meet a single one of them, additional testimony about the legislative findings in the Ordinance—no matter what it was—would have no effect.

[3] This presents no issue for us because the Florida Supreme Court has ruled that a trial court's decision is primarily what matters, not the reasoning it used. *See Applegate v. Barnett Bank of Tallahassee*, 377 So. 2d 1150, 1152 (Fla. 1979). "Even when based on erroneous reasoning, a conclusion or decision of a trial court will generally be affirmed if the evidence or an

24

summary is misleading because it only describes one of the two ways in which the County will control rent. Stated differently, a voter reviewing the summary might be able to ascertain that the County wished to impose rent control, but he or she would be misled as to how the County would effectuate it.

We review de novo the trial court's determination that the ballot summary was invalid. *See City of Riviera Beach v. Riviera Beach Citizens Task Force*, 87 So. 3d 18, 21 (Fla. 4th DCA 2012). In so doing, we must evaluate whether the ballot language satisfies the requirements of section 101.161, Florida Statutes. *See Fla. Educ. Ass'n v. Fla. Dep't of State*, 48 So. 3d 694, 700 (Fla. 2010). This statute requires that a ballot summary "shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure." § 101.161(1). The ballot title "shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of." *Id.*

These requirements are designed to provide fair notice of a proposed law's content, so that a voter can cast an intelligent and informed vote and not be misled as to the proposed law's purpose. *See Advisory Op. to Att'y*

---

alternative theory supports it." *Id.* (citations omitted); *see also Dade Cnty. Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 644–45 (Fla. 1999)*.*

*Gen. re Use of Marijuana for Debilitating Med. Conditions*, 181 So. 3d 471, 478 (Fla. 2015) (quoting *Advisory Op. to Att'y Gen. re Term Limits Pledge*, 718 So. 2d 798, 803 (Fla. 1998)).  Indeed, voters must be able to understand how far a proposed law sweeps from the ballot title and summary, so that the proposed law "is neither less nor more extensive than it appears to be." *See Smathers v. Smith*, 338 So. 2d 825, 829 (Fla. 1976).  A ballot title and summary do not have to explain every detail of the proposed law, but rather its chief purpose.  *City of Riviera Beach*, 87 So. 3d at 21.

In determining whether section 101.161's requirements are satisfied, we consider two questions: "(1) whether the ballot title and summary, in clear and unambiguous language, fairly inform the voters of the chief purpose of the amendment; and (2) whether the language of the ballot title and summary, as written, will be affirmatively misleading to voters." *Advisory Op. to Att'y Gen. re Regulate Marijuana in a Manner Similar to Alcohol to Establish Age, Licensing, & Other Restrictions*, 320 So. 3d 657, 667–68 (Fla. 2021) (quoting *Advisory Op. to Att'y Gen. re Use of Marijuana for Certain Med. Conditions*, 132 So. 3d 786, 797 (Fla. 2014)).  Indeed, a ballot summary may be defective if it "omits material facts necessary to make the summary not misleading."  *Advisory Op. to Att'y Gen.—Ltd. Pol. Terms in Certain Elective Offs.*, 592 So. 2d 225, 228 (Fla. 1991).

26

The ballot title and summary state:

**Rent Stabilization Ordinance to
Limit Rent Increase for Certain
Residential Rental Units**

Shall the Orange County Rent Stabilization Ordinance, which limits rent increases for certain residential rental units in multifamily structures to the average annual increase in the Consumer Price Index, and requires the County to create a process for landlords to request an exception to the limitation on the rent increase based on an opportunity to receive a fair and reasonable return on investment, be approved for a period of one year?

The summary is misleading not because of what it says, but because of what it does not say. Critically, the Ordinance purports to control rent in two ways. The first restricts the frequency of rental increases to one time per twelve-month period. The second limits the amount of these increases by tying them to the Consumer Price Index. The ballot summary, however, only advises the voter about the amount of rent control, but not its frequency. This omission is confusing because the chief purpose of the initiative is rent control, but the ballot summary misleads on how the Ordinance will effectuate this purpose. It does not, in other words, accurately advise a voter about the Ordinance's scope, thus, portraying the measure as "less . . . extensive than it appears to be." *See Smathers*, 338 So. 2d at 829. The Ordinance does not provide, and would be completely different, for allowing landlords to raise rent on month-to-month leases every month for the year it

27

was in effect, provided all twelve increases were tied to the Consumer Price Index.

This fatal omission is also completely avoidable. We can conceive of several alterations that would fully inform voters while still satisfying the word limit. Florida law does not require a ballot summary to explain every detail in the seventy-five-word limit. *See Advisory Op. to the Att'y Gen. re Prohibiting Pub. Funding of Pol. Candidates' Campaigns*, 693 So. 2d 972, 975 (Fla. 1997); *see also Matheson v. Miami-Dade Cnty.*, 187 So. 3d 221, 225–26 (Fla. 3d DCA 2015) ("Florida courts have previously held that section 101.161(1) does not require excessive detail."). But it cannot mislead with what it does say. *See Armstrong v. Harris*, 773 So. 2d 7, 21 (Fla. 2000) (concluding that "ballot language in the present case is defective for what it does not say"); *Askew v. Firestone*, 421 So. 2d 151, 156 (Fla. 1982) ("The problem, therefore, lies not with what the summary says, but, rather, with what it does not say."). For this reason, although it employed a different rationale, the trial court correctly determined that the Association was substantially likely to succeed in its efforts to remove the referendum on the Ordinance from the ballot.

28

## 2.    Irreparable Harm & No Adequate Legal Remedy

The trial court erred, however, when it concluded it should not afford the Association temporary relief because it had not been irreparably harmed and the Association had an adequate legal remedy.   The concepts of irreparable harm and no adequate legal remedy are distinct prongs of the temporary injunction test, but they are related to one another.  *See, e.g.*, *Corp. Mgmt. Advisors, Inc. v. Boghos*, 756 So. 2d 246, 247 (Fla. 5th DCA 2000) (citations omitted) ("The question of whether the injury is 'irreparable' turns on whether there is an adequate remedy available.").  Accordingly, we discuss them together.

"Irreparable" means an injury cannot be adequately repaired or redressed in a court of law by an award of money damages.  *Air Ambulance Network, Inc. v. Floribus*, 511 So. 2d 702, 702 (Fla. 3d DCA 1987).  An injury is not irreparable if it is "doubtful, eventual or contingent."  *Jacksonville Elec. Auth. v. Beemik Builders & Constructors, Inc.*, 487 So. 2d 372, 373 (Fla. 1st DCA 1986) (citation omitted). Further, irreparable injury will never be found "when a plaintiff's right to recover is based upon a future event" or the alleged injury is speculative.  *Biscayne Park, LLC v. Wal-Mart Stores E., LP*, 34 So. 3d 24, 26 (Fla. 3d DCA 2010).  Instead, the irreparable injury must be "actual and imminent."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).  It

29

is an injury of such a "peculiar nature" that money cannot adequately "atone for it." *Liza Danielle, Inc. v. Jamko, Inc.*, 408 So. 2d 735, 738 (Fla. 3d DCA 1982) (citation omitted).

An "adequate remedy at law" refers to a litigant's ability to obtain a monetary judgment, and not whether that judgment will be collectible once obtained. *Holland M. Ware Charitable Found. v. Tamez Pine Straw, LLC*, 343 So. 3d 1285, 1289–90 (Fla. 1st DCA 2022); *see Am. Sur. Co. of N.Y. v. Murphy*, 13 So. 2d 442, 443 (Fla. 1943) (stating general proposition that party will not be able to assert equitable claims if it has "a complete and adequate remedy at law").

The Association suffered—and continues to suffer—irreparable harm because the County enacted an unconstitutional law. A county ordinance that conflicts directly with a state statute is unconstitutional. *See Miami-Dade Cnty. v. Miami Gardens Square One, Inc.*, 314 So. 3d 389, 392–93 (Fla. 3d DCA 2020). And "a continuing constitutional violation, in and of itself, constitutes irreparable harm." *Bd. of Cnty. Comm'rs, Santa Rosa Cnty. v. Home Builders Ass'n of W. Fla.*, 325 So. 3d 981, 985 (Fla. 1st DCA 2021) (quoting *Fla. Dep't of Health v. Florigrown, LLC*, 320 So. 3d 195, 200 (Fla. 1st DCA 2019), *quashed on other grounds by* 317 So. 3d 1101 (Fla. 2021)). The Ordinance plainly falls short of section 125.0103's high bar, and thus, it

is unconstitutional. Because we presume the Association suffers irreparable harm in this situation, the trial court erred by finding otherwise.

The Association has also suffered a different type of irreparable harm in connection with both the Ordinance and the misleading ballot summary. Here, the trial court erred by overlooking unrebutted evidence on this point. Two Association executives testified that its members were having difficulty obtaining loans because lenders had grown more apprehensive about investing in the commercial rental market due to the possibility of rent control. Further, the Association has had to devote all its resources to defeating the measure before its enactment. The County made no effort to challenge this testimony on cross-examination. The attested injuries are actual, and they are neither speculative nor compensable. In this sense, competent, substantial evidence does not support the trial court's finding that the Association's harm would be mooted if voters rejected this measure on Election Day, and we must therefore reject it.

This evidence also shows the Association has no adequate legal remedy. The County is protected by sovereign immunity, and neither the Association nor its members could recover damages for the harm it has and will incur even if those damages were quantifiable. Separately, the only remedy for a misleading ballot measure is its removal from the ballot. *See*

31

*Let Miami Beach Decide v. City of Miami Beach*, 120 So. 3d 1282, 1292 (Fla. 3d DCA 2013); *see also Detzner v. League of Women Voters of Fla.*, 256 So. 3d 803 (Fla. 2018) (affirming entry of permanent injunction enjoining secretary of state from placing misleading proposed constitutional revision on ballot). In this sense, the Association has no other remedy, much less an adequate remedy at law, for the County's misleading ballot summary.

### 3. **The Public Interest**

Finally, the public interest supports the issuance of the Association's temporary injunction. The trial court reasoned that no harm could come of the public offering its opinion on a measure that had no likelihood of legal success, and that it would not substitute its judgment for that of Orange County's elected representatives. Respectfully, we disagree.

No public interest can be served by allowing the potential enforcement of a rent control ordinance that fails to meet the facial requirements of section 125.0103, and Article 8, section 1 of the Florida Constitution. We recognize that a local government's aim to enact legislation to address a complex, multifaceted issue is noble, and citizens might believe that rent control is a harmless way to accomplish that aim. But as we stated at the outset of this opinion, the power of local government is limited, and a critical limitation on this power is the Florida Constitution.

Similarly, no public interest can be served by having the electorate vote on a misleading ballot measure. Our constitution already reflects this concern. It requires the Florida Supreme Court to render an advisory opinion on the validity of any proposed amendment to our constitution via initiative petition before it appears on the ballot. *See* Art. 4, § 10; Art. 5, § 3, Fla. Const. While we cannot, and do not, evaluate such a proposed amendment, we see no reason why the same principle should not apply here. Stated differently, there is no defensible reason to determine a ballot initiative is misleading, yet still have the electorate vote on it, only then informing them that we knew it was an unenforceable opinion poll all along. We recognize that the removal of the County's ballot initiative is a significant remedy, and we do not exercise it lightly. But it is the only remedy available, and the law requires we impose it. *See Let Miami Beach Decide*, 120 So. 3d at 1292.

## V.     Conclusion

For these reasons, the trial court erred in denying the Association's motion for temporary injunction. We reverse and remand for its immediate issuance. We have considered the Supervisor of Elections' arguments about his available options given this determination and the timing of its issuance. Based on the Florida Constitution's admonition about the separation of powers, we decline to dictate precisely *how* the Supervisor of Elections

33

should effectuate the relief imposed by the temporary injunction vis-à-vis the November 2022 election. *See* Art. II, § 3, Fla. Const. We anticipate at a minimum, however, that the results of the ballot initiative will not be certified.

AFFIRMED in Part; REVERSED in Part; and REMANDED WITH INSTRUCTIONS.


SASSO, J., concurs.
COHEN, J., dissents, with opinion.

COHEN, J., dissenting with opinion.

In this appeal, we are asked to review nearly 100 years of law, state statutes, and multiple briefs, and to provide an analysis in just a few days.[1] I commend the majority's work in this case, as that is no easy task. However, I cannot agree with the majority's result, which effectively removes from the ballot an ordinance proposed by a duly elected body, the County Commissioners of Orange County ("the County").

The procedural posture of this case has import. The case comes to us on appeal from the denial of a temporary injunction. Before reaching the crux of the matter, it is instructive to remember that the appellants, Florida Realtors and Florida Apartment Association, Inc. (collectively, "Realtors"), must establish: (1) a substantial likelihood of success on the merits, (2) a lack of an adequate remedy at law, (3) the likelihood of irreparable harm absent the entry of an injunction, and (4) that injunctive relief will serve the public interest. Gainesville Woman Care, LLC v. State, 210 So. 3d 1243, 1258 (Fla. 2017) (citing Reform Party of Fla. v. Black, 885 So. 2d 303, 305 (Fla. 2004)). Despite the trial court's ruling that Realtors did not establish the

---

[1] This case was not perfected until October 11, 2022.

last three of the four elements, the majority reverses that ruling by utilizing, in part, the trial court's finding as to the first element—a substantial likelihood of success on the merits—to support its conclusions that Realtors had also satisfied the remaining elements.

The County presented a plethora of facts supporting its position that a housing crisis exists in Orange County, an emergency so grave as to constitute a serious menace to the general public. § 125.0103(2), (5)(b), Fla. Stat. For the most part, Realtors did not dispute those facts. As a result, our review should be limited to whether those facts are sufficient to fulfill the statutory requirements.

There was scant law to assist the trial court (or this Court) in making that determination. As such, the trial court relied on the facts outlined in Edgar A. Levy Leasing Co. v. Siegel, 258 U.S. 242 (1922), the seminal case on rent control from the United States Supreme Court.[2] The Supreme Court noted the circumstances that existed in New York in the early twentieth century:

> That there was a very great shortage in dwelling house accommodations in the cities of the state to which the acts apply; that this condition was causing widespread distress; that extortion in most oppressive forms was flagrant in rent profiteering; that, for the purpose of increasing rents, legal

---

[2] The pertinent language of section 125.0103 mirrors that of Siegel.

36

> process was being abused and eviction was being resorted to as never before; and that unreasonable and extortionate increases of rent had frequently resulted in two or more families being obliged to occupy an apartment adequate only for one family, with a consequent overcrowding, which was resulting in insanitary conditions, disease, immorality, discomfort, and widespread social discontent.

Siegel, 258 U.S. at 246.

Nowhere in Siegel, or throughout the intervening years, does the Supreme Court suggest that the facts present in Siegel should be considered the baseline or measuring stick for establishing what constitutes a housing emergency necessitating the enactment of rent control ordinances; we would hardly expect the circumstances of Siegel to be identically replicated since that time. Thus, the trial court's use of the specific factual circumstances in Siegel as setting some sort of baseline to demonstrate an emergency was misplaced.

That is not to say that Siegel is wholly inapplicable. Importantly, in affirming the New York rent control laws at issue, the Supreme Court noted the "very great respect which courts must give to the legislative declaration that an emergency existed." Id. We should do the same. After all, the judiciary's statutorily mandated review is to determine whether the County has met its burden of establishing a grave housing emergency sufficient to

37

enact a rent control ordinance, and we should give deference to the County's factual findings substantiating that need. See id.

Just as Siegel considered the circumstances facing the residents of New York, we must look at the circumstances particular to Orange County residents. Orange County is facing an issue found virtually nowhere else among the 67 counties in Florida.[3] Its economy is based in large part upon tourism, and it is well documented that a significant portion of Orange County's population is employed in associated low-paying jobs in that industry. Over 80% of households in Orange County are earning at or below the average median income. Those households spend more than 30% of their household income on rent and are having difficulty affording other life necessities such as food, clothing, transportation, and medical care. It is within that context that the County examined the current housing market.[4]

Moreover, approximately 40% of Orange County's population are renters. The legislative factual findings also noted that inflation, housing prices, and rental rates in Orange County are "increasing, accelerating, and spiraling." There has been a 43% increase in median home sales prices from

---

[3] Osceola County is similarly situated.

[4] During the pandemic, Orange County received more funds from the State's now-terminated COVID-19 emergency rental assistance program than any other county in Florida.

38

May 2020 to May 2022, signaling that the percentage of renters is likely to continue to increase as fewer residents become able to afford to purchase their own homes. At the same time, there has been a 25% increase in asking rent per unit from 2020 to 2021, the highest increase since 2006 when it was only 6.7%. All the while, the population of Orange County continues to grow, with a population increase of 25% from 2010 to 2020, further exacerbating the housing crisis, especially when there is a documented shortage of approximately 26,500 housing units in the county.

More and more residents in Orange County are unable to afford even the most basic housing, resulting in a dramatic increase in evictions: through the first half of 2022, there have been nearly 7,000 eviction cases filed, representing a 70% increase when compared to the same time frame in 2021. Contrary to the position taken by Realtors, these circumstances reflect more than a mere inflationary spiral.

Realtors do not dispute that, as a result of the affordable housing shortage, families are struggling to afford essential life necessities, from food and utilities to medical expenses, at the same time that the decreased ability to pay for transportation affects employment opportunities. These are not simply statistics; these factual findings reflect real people facing rent hikes

that are not only historic, but which dwarf prior records and show no signs of abating given the undisputed population growth and housing shortage.

Realtors posit that the dire economic straits of a significant portion of Orange County residents do not rise to the level of a housing emergency justifying a rent control ordinance—one that is limited in scope and duration and which provides exemptions to ensure that rental property owners retain the right to receive a fair and reasonable return on investment.[5] While Realtors are naturally advocating for the financial interests of their members, the County has a broader perspective. The County, having examined all the facts, which objectively could be characterized as a perfect storm, decided to act.[6] It determined that Orange County is in the midst of a grave housing emergency, constituting a serious menace to the general public. § 125.0103(2), (5)(b), Fla. Stat.

Accordingly, I would find that, as a matter of law, the County has met its burden under section 125.0103. I would therefore affirm the trial court's

---

[5] The ordinance would only be applicable to certain residential units in multi-family structures and would not impact individuals who own single-family rental properties.

[6] As a legislative body, the County was not bound by the opinions of its consultant as to the ultimate determination of whether the facts as established constituted a grave housing emergency.

denial of temporary injunctive relief and allow the residents of Orange County to vote on the ordinance in the upcoming election.

Turning to the ballot summary aspect of this case, I agree with the majority that the trial court's basis for concluding that the ballot language was defective was flawed, i.e., that it failed to "inform the public that the ordinance would criminalize previously lawful conduct." However, I disagree with the majority's conclusion that the ballot language was nonetheless defective because it "only describes one of the two ways in which the County will control rent." All that Florida law requires is that the language used to summarize the ordinance "give the voters 'fair notice' of the decision they must make." Dep't of State v. Fla. Greyhound Ass'n, Inc., 253 So. 3d 513, 519 (Fla. 2018) (citing Miami Dolphins, Ltd. v. Metro. Dade Cnty., 394 So. 2d 981, 987 (Fla. 1981)). Under Florida law, the ballot summary is limited to 75 words, must be "printed in clear and unambiguous language on the ballot," and "shall be an explanatory statement . . . of the chief purpose of the measure." § 101.161(1), Fla. Stat. (2022). The ballot summary does not have to "explain every detail or ramification of the proposed amendment." City of Riviera Beach v. Riviera Beach Citizens Task Force, 87 So. 3d 18, 21 (Fla. 4th DCA 2012) (quoting Fla. Educ. Ass'n v. Fla. Dep't of State, 48 So. 3d 694, 700 (Fla. 2010)).

In determining whether the statutory requirements are satisfied, this Court considers two questions: "(1) whether the ballot title and summary, in clear and unambiguous language, fairly inform the voters of the chief purpose of the amendment; and (2) whether the language of the ballot title and summary, as written, will be affirmatively misleading to voters." Advisory Op. to Att'y Gen. re Regulate Marijuana in a Manner Similar to Alcohol to Establish Age, Licensing, & Other Restrictions, 320 So. 3d 657, 667–68 (Fla. 2021) (quoting Advisory Op. to Att'y Gen. re Use of Marijuana for Certain Med. Conditions, 132 So. 3d 786, 797 (Fla. 2014)).

Here, the ballot summary clearly sets out the main purpose of the ordinance—to limit rent increases for certain residential rental units to not exceed the Consumer Price Index. The frequency with which such rent can be increased over the one-year time frame allowed by law is not the chief purpose of the ordinance; nor does the absence of those details render the summary misleading. Simply put, under Florida law, the ballot summary did not have to contain every detail or ramification of the ordinance to provide its chief purpose within the 75-word limit. I also respectfully dissent from the majority's view on the propriety of Orange County's ballot summary.